**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **23-cv-287** |
| **Plaintiff,** | **ECF Case** |
| **v.** | **Complaint** |
| **GENESIS GLOBAL CAPITAL, LLC and GEMINI TRUST COMPANY, LLC,** | **Jury Trial Demanded** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") files this Complaint against Genesis Global Capital, LLC ("Genesis") and Gemini Trust Company, LLC ("Gemini") (collectively, "Defendants") and alleges as follows:

**SUMMARY**

1.      Between February 2021 and November 2022, Genesis and Gemini engaged in an unregistered offer and sale of securities to U.S. retail investors, in violation of the federal securities laws. Through an investment opportunity that Defendants called the "Gemini Earn" program, investors tendered crypto assets to Genesis and, in exchange, Genesis promised to pay interest on those assets to investors. Through this unregistered offering, Defendants raised billions of dollars' worth of crypto assets, principally from U.S. retail investors.

2.      Both Defendants were integral to the operation and success of the Gemini Earn program. Genesis was the issuer and entity that received, pooled, deployed, and paid interest on investors' assets. Genesis and Gemini marketed the Gemini Earn program through social media and Gemini's website, touting the high interest rates that investors could earn through Gemini Earn. And Gemini provided retail investors with access to Genesis, which otherwise only

engaged in crypto asset transactions with large institutional and other accredited investors.[1]
Crucially, both Defendants profited from the partnership and offering.

3.      To participate in the Gemini Earn program, Genesis and Gemini required that
investors enter into a tri-party Master Digital Asset Loan Agreement with Genesis and Gemini
("Gemini Earn Agreement"), whereby Gemini Earn investors provided crypto assets to Genesis,
with Gemini acting as the agent in the issuance. Genesis would send interest payments to
Gemini, which would then deduct an "Agent Fee" before distributing the remainder of the
interest payments to Gemini Earn investors.

4.      Genesis pooled the crypto assets from Gemini Earn investors with assets from
other investors. Genesis then deployed the crypto assets – primarily by lending the crypto assets
to institutional counterparties ("Institutional Borrowers") – in order to generate revenue for its
business, including the revenue necessary to pay interest to Gemini Earn investors. Genesis
earned revenue by lending the crypto assets at a higher rate than it paid to Gemini Earn and other
investors.

5.      The Genesis Earn Agreements, as offered and sold through the Gemini Earn
program, were securities that Genesis and Gemini offered and sold to the investing public.

6.      Defendants offered and sold the Gemini Earn Agreements through the Gemini
Earn Program without registering the offer and sale with the SEC as required by the federal
securities laws. As a result, investors lacked material information about the Gemini Earn
program that would have been relevant to their investment decisions. Instead of providing
investors with the full panoply of information required by the federal securities laws, Defendants

---

[1] "Accredited investors" are those persons whose financial sophistication and ability to sustain the risk of
loss of investment or fend for themselves render the protections of the Securities Act of 1933's
registration process unnecessary. *See* Rule 501(a) of the Securities Act of 1933 [17 C.F.R. § 230.501].

have instead only made selective and inadequate disclosures.

7.      The U.S. retail investors who participated in the Gemini Earn program have suffered significant harm. In November 2022, Genesis unilaterally announced that it would not allow hundreds of thousands of retail investors to withdraw their crypto assets from Gemini Earn because of "withdrawal requests which have exceeded our current liquidity" following volatility in the crypto asset market. At the time, Genesis held approximately $900 million in investor assets from approximately 340,000 Gemini Earn investors, most residing in the United States. As of the date of this Complaint, these retail investors still cannot withdraw their assets, and Genesis has formed a special committee to oversee a restructuring process.

8.      While the Gemini Earn program has been terminated, both Genesis and Gemini continue to do business in the crypto asset industry. In particular, Genesis intends to reengage in crypto asset lending activities. Gemini continues to hold billions of dollars' worth of crypto assets on behalf of retail investors in connection with its trading platform and other activity in this industry. Thus, Defendants remain positioned to violate the registration provisions if they are not enjoined from doing so.

**VIOLATIONS**

9.      By engaging in the conduct described in this Complaint, Defendants violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

10.      Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

11.      The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Sections 5(a) and 5(c) of the Securities Act, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S. Code § 78u(d)(3), (5), (7)]; and (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

14.     Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Gemini's principal place of business is in this District, and Defendants sold the securities at issue in this case to investors residing in this District.

## DEFENDANTS

16.     **Genesis Global Capital, LLC ("Genesis")** is a Delaware limited liability company formed in 2017 and a wholly owned subsidiary of Genesis Global Holdco, LLC, which is wholly owned by Digital Currency Group, Inc. ("DCG"). Genesis' principal place of business is in Jersey City, New Jersey. Genesis claims that it is the "premier institutional digital asset

financial services firm,"[2] and "the world's largest digital asset lender" and that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." Genesis is registered with FinCEN as a money services business (*i.e.*, money transmitter). Genesis is one of several companies that DCG operates under the "Genesis" brand. Genesis is the issuer of securities under the Gemini Earn program.

17.    **Gemini Trust Company, LLC** ("Gemini") is a New York limited liability trust company founded in 2014. Gemini is beneficially owned and controlled by Cameron and Tyler Winklevoss through Winklevoss Capital Fund, LLC. Gemini's principal place of business is in New York, New York. Gemini is registered as a New York limited purpose trust company with the New York State Department of Financial Services ("NYSDFS").

## STATUTORY AND REGULATORY FRAMEWORK

18.     The Securities Act sets forth a longstanding regime of full and fair disclosure in connection with the offer and sale of securities, in contrast to traditional commercial principles of caveat emptor. Congress mandated that persons who offer and sell securities to the investing public provide sufficient, accurate information to allow investors to make informed decisions before they invest.

19.     The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts" and "notes." An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the

---

[2] A "digital asset" is another term for crypto asset.

promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (citations and internal quotation marks omitted) (emphasis in original). Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the Internet, including crypto assets.

20.     Sections 5(a) and 5(c) of the Securities Act require that an issuer like Genesis register the offer or sale of securities with the SEC. Similarly, those provisions prohibit Gemini from engaging in the offer and sale of such unregistered securities. Registration statements relating to an offering of securities provide public investors with material information about the issuer and the offering, including but not limited to financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

## BACKGROUND ON CRYPTO ASSETS

21.     The term "crypto asset" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens."

22.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of

transactions.

## FACTS

### I.    Genesis and Gemini Offered and Sold Investments

23.     In March 2018, Genesis began obtaining crypto assets from large institutional and other accredited investors in exchange for a promise to pay interest on those investors' crypto assets. Genesis obtained crypto assets from its various investors for the use of its primary business – *i.e.*, to lend crypto assets to Institutional Borrowers for interest – which generated revenue for Genesis and allowed it to pay interest to large institutional and other accredited investors. Genesis earned profit by lending the crypto assets to Institutional Borrowers at a higher rate than it paid to its investors. Genesis pooled the investors' crypto assets and exercised discretion over how to deploy the assets to earn income.

24.     Eventually, Genesis expanded its business model to transact with not just institutional and accredited investors, but also retail investors. In particular, in December 2020, Genesis entered into an agreement with Gemini to offer Gemini customers, including U.S. retail investors, an opportunity to tender their crypto assets to Genesis in exchange for Genesis' promise to pay interest.

### *Gemini Earn Program*

25.     Specifically, beginning in February 2021, Genesis and Gemini began offering the Gemini Earn program to retail investors in the United States and Hong Kong, and later Singapore. There was no minimum investment amount to be eligible to participate in the Gemini Earn program. As of November 16, 2022, approximately 340,000 retail investors, most residing in the United States, had crypto assets invested with Genesis through the Gemini Earn program. By November 2022, the value of retail investors' crypto assets held by Gemini exceeded the

collective value of those tendered by institutional and accredited investors.

26.     Each Gemini Earn investor entered into a tri-party Gemini Earn Agreement with Gemini and Genesis. The agreement was a standard agreement and not individually negotiated with Gemini Earn investors. Under the terms of the Gemini Earn Agreement, Gemini Earn investors first needed to hold eligible crypto assets with Gemini – either by transferring the crypto assets to Gemini or acquiring them via Gemini's crypto asset trading platform. Through Gemini Earn, investors would then tender their crypto assets to Genesis, with Gemini acting as the agent for retail investors to facilitate the transaction. Gemini aggregated the crypto assets to be invested in the Gemini Earn program and placed them in a digital wallet from which Genesis would take possession of the assets.

27.     Genesis determined the types and aggregate amount of each crypto asset that were eligible to be invested by Gemini Earn investors. Genesis offered and agreed to pay the Gemini Earn investors in-kind interest on the crypto assets they had invested, which accrued on a daily basis. Genesis could unilaterally revise the interest rates and the aggregate amount of each crypto asset that Gemini Earn investors could invest, on a monthly basis.

28.     Gemini Earn investors' returns came from Genesis, with Gemini deducting an Agent Fee from the returns. Genesis had sole discretion over the gross interest rate that it paid for each crypto asset, while Gemini had sole discretion over its Agent Fee and thus the net rates of return offered to Gemini Earn investors.

29.     Gemini published the list of crypto assets eligible for investment and the interest rates offered to Gemini Earn investors on its website as well as in Gemini's mobile application ("app"). More than 50 crypto assets were eligible to be invested in the Gemini Earn program, including Bitcoin, Ether, USD Coin, and Dogecoin.

30.     As of October 2022, the net interest rate offered to Gemini Earn investors ranged from 0.45% to 8.05%, while Gemini's Agent Fee ranged from 0.06% to 4.29%, depending on the type of crypto asset tendered to Genesis. For the three months ended March 31, 2022, Gemini received approximately $2.7 million in Agent Fees from the Gemini Earn program.

31.     The Gemini Earn Agreement provided that the crypto asset transactions were "open term" unless otherwise specified, and Gemini Earn investors could terminate all, or a portion, of their investment in Gemini Earn at any time with no withdrawal fee. Per the Gemini Earn Agreement, Genesis was also obligated to return the invested crypto assets within three business days of an investor's request for repayment to a digital wallet controlled by Gemini, and Gemini would then transfer the crypto assets and any accrued interest to the investor's Gemini account where the assets and interest would be available for withdrawal. The Gemini Earn Agreement also provided that Genesis was responsible for repaying the crypto assets and all accrued interest to the Gemini Earn investors.

32.     Under the terms of the Gemini Earn Agreement, a failure by Genesis to return crypto assets or a failure by Genesis to pay interest or late fees to a Gemini Earn investor is considered an event of default. In the event of a default, Gemini may declare the entire Gemini Earn balance payable, transfer any collateral to hold on behalf of itself and the Gemini Earn investors, and/or exercise all other rights and remedies available. If the event of default persists for 30 days or more, Gemini may terminate the Gemini Earn Agreement.

### *Genesis and Gemini Promoted Gemini Earn as an Investment*

33.     Genesis and Gemini both touted the profits investors could earn by investing their crypto assets with Genesis through Gemini Earn. Genesis advertised on its public website that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis."

Genesis also published tweets highlighting its partnership with Gemini and the yield that Gemini Earn investors – *i.e.*, retail investors – could earn. For example, on February 2, 2021, Genesis published a tweet stating, "Genesis is dedicated to building and partnering to lower barriers to digital asset markets."

34.     Gemini similarly promoted the profit that investors could earn through the Gemini Earn program. In a February 2021 press release launching Gemini Earn, Gemini CEO Tyler Winklevoss stated, "We designed a program that allows our customers the ability to generate a real return on their crypto holdings." On February 27, 2021, Gemini also posted a video on YouTube titled, "Invest Better with Gemini Earn." On its website, Gemini described how users would earn interest, noting, "We are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." Similarly, Gemini advertised on its website that investors could "[p]ut your crypto to work. With Gemini Earn, you can receive up to 8.05% APY on your cryptocurrency," and listed the interest rate that investors could earn for each eligible crypto asset. Gemini also published tweets, including on May 26, 2021, promoting the high interest rates offered via Gemini Earn, with statements such as the following:



35.     Gemini itself repeatedly described Gemini Earn as an investment on its website. For example, Gemini included this description in an FAQ entitled, "What are the risks of Gemini

Earn?":

> Cryptocurrency, like many assets, can be volatile and subject to price swings. There is always a risk in <u>investing</u>, and each customer needs to assess their own risk tolerance before making any <u>investment decisions</u>. Our partners in Gemini Earn have an obligation to return funds according to the terms of their loan agreement. However, Gemini Earn customers (the lenders) always assume some level of risk when they decide to lend their funds. We believe Gemini Earn gives our retail investors another way to stay long-term in the asset class and have the <u>option to invest and earn interest</u>, all on the Gemini platform.

> (emphasis added)

36.     Gemini's website also claimed that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market" and that Gemini Earn "offer[s] more flexibility than other yield-generating cryptocurrency investments."

37.     Additionally, Gemini's website featured a calculator that would allow a user to select a deposit amount, crypto asset type, and a time frame to see how much interest could be earned by tendering crypto assets through Gemini Earn. The calculator would reveal the projected amount of interest that could be earned by investing the investor's crypto assets for a period between one and four years.

### Genesis' Deployment of the Invested Gemini Earn Crypto Assets

38.     Genesis pooled on its balance sheet the crypto assets that it received from the Gemini Earn investors and other investors, and in practice did not segregate the crypto assets it received from different groups of investors. Genesis retained possession and control over the investors' crypto assets on its balance sheet, and determined how much to hold, lend out to others, and otherwise use. Genesis exercised its discretion in how to use investors' crypto assets to generate revenue for its business and to pay the interest rates it promised Gemini Earn investors and other investors. The Gemini Earn Agreement did not contain any explicit terms restricting how investors' crypto assets would be used by Genesis.

39.     Generally, Genesis deployed the Gemini Earn investors' crypto assets by either lending them to Institutional Borrowers or using the assets as collateral for Genesis' own borrowing. Crypto assets not loaned to Institutional Borrowers or used for collateral were held by Genesis on its balance sheet in an effort to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program, including Gemini Earn. Genesis also had the ability to loan the crypto assets to related parties, including its parent company.

40.     Genesis employed its discretion and judgment in determining the terms of transactions with Institutional Borrowers. For example, Genesis conducted due diligence on the Institutional Borrowers before entering into a transaction. Genesis negotiated an initial agreement with each Institutional Borrower, and then individually negotiated the terms – including the type of crypto assets to be lent, interest rate, duration of the loan, and collateral (if any) – of every subsequent lending transaction. Genesis separately evaluated each Institutional Borrower, as well as market conditions, when determining collateral rates.

41.     The returns earned by each Gemini Earn investor were reliant on the pooling of the invested crypto assets and the ways in which Genesis deployed those assets, including Genesis' evaluation of the Institutional Borrowers, negotiation of favorable terms, and management of market and counterparty risk. When Genesis loaned crypto assets it received through the Gemini Earn program, the assets were transferred to the Institutional Borrowers and left Genesis' balance sheet. Ultimately, the returns of Gemini Earn investors were dependent on Genesis' managerial efforts and risk management in its lending activities.

42.     The interest income that Genesis received from lending crypto assets to Institutional Borrowers was used to generate revenue for Genesis and to pay the promised

interest to Gemini Earn investors and other investors. Genesis did not have any other revenue-generating activities. For example, for the three months ended March 31, 2022, Genesis received approximately $169.8 million in interest income from Institutional Borrowers and paid $166.2 million in interest to the investors in its crypto asset program, including Gemini Earn.

43.     Genesis also loaned an additional $575 million worth of crypto assets, including those of Gemini Earn investors, to related party DCG, which DCG used to fund investment opportunities and repurchase DCG stock from non-employee shareholders in secondary transactions.

**II.     The Gemini Earn Program Constituted an Offer and Sale of Securities**

   **A.  The Gemini Earn Program Constituted an Offer and Sale of Securities Under**
       ***Reves***

44.     Under Section 2(a)(1) of the Securities Act, the definition of a security includes any "note." *See* 15 U.S.C. §§ 77b, 78c. A note is presumed to be a security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory regime that "significantly reduces the risk of the instrument" for investors other than the securities laws, "thereby rendering application of the Securities Acts unnecessary." *See Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990). Under *Reves*, the Gemini Earn Agreements were notes and offered and sold through Gemini Earn as securities.

       **1.  The Purpose of the Gemini Earn Program**

45.     Genesis offered the Gemini Earn program to obtain crypto assets for the use of its business – namely, to run its institutional lending activities, generate profits for itself, and to pay the interest promised to Genesis investors, and investors in Gemini Earn were primarily

interested in the profit they expected the program to generate.

46.     Genesis controlled the crypto assets it obtained from investors and had complete discretion in determining how much to hold, lend and otherwise use. Genesis used the crypto assets it raised from Gemini Earn investors and other investors to make loans to Institutional Borrowers or as collateral for Genesis' own borrowing. Genesis also had the discretion to hold the assets on its balance sheet to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program.

47.     In turn, investors participated in the Gemini Earn program primarily for profit, *i.e.*, to receive a return on their crypto assets. Genesis and Gemini both touted the profits investors could earn by investing their crypto assets with Genesis, including by advertising Gemini Earn as an investment and touting that investors could receive up to 8.05% annual percentage yield ("APY") on their crypto assets. Investors who purchased the Gemini Earn notes were led to expect that by tendering and giving control over their crypto assets to Genesis, they would receive profit in the form of interest on those assets.

48.     In short, Genesis intended to use the crypto assets for its business and its sole source of revenue, and the Gemini Earn investors were primarily motivated to earn a profit on their crypto assets in the form of interest.

**2. The Gemini Earn Program was Offered and Sold to a Broad Segment of the Public**

49.     Genesis and Gemini publicly advertised the Gemini Earn Agreements, through Gemini Earn, on websites and on social media. Moreover, the Gemini Earn Agreements were offered and sold to any U.S. investor, including retail investors. As of November 16, 2022, there were approximately 340,000 retail investors, the majority of whom resided in the United States, who had crypto assets invested with Genesis through the Gemini Earn program. The Gemini

Earn Agreements were offered and sold to a broad segment of the general public.

### 3.   The Investing Public Considered these Notes as Investments

50.      Genesis and Gemini, through websites and social media, promoted Gemini Earn as an investment, specifically as a way to earn high "returns" or "yield" on investors' crypto assets. Gemini repeatedly described Gemini Earn as an investment on its own website and social media and repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and "higher than most existing options." Gemini's website further claimed that Gemini Earn investors could "receive more than 100x the national interest rate." Gemini's website also included a calculator that showed a user potentially how much interest they could earn by investing their crypto assets in the Gemini Earn program for a period between one and four years. The economic realities of the transaction, in which investors had an opportunity to tender crypto assets with Genesis in exchange for earning interest with some of the "highest rates" available for crypto assets, further underscore why the investing public considered the Gemini Earn program to be an investment opportunity.

### 4.   No Alternative Regulatory Regime or Risk-Reducing Factors Exist to Protect Gemini Earn Investors

51.      No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to the Gemini Earn program. In its own FAQs, Genesis noted that "[D]igital assets are not covered by SIPC insurance" and that "[e]stablishing a lending and borrowing relationship with Genesis is not the same as opening a depository account or a savings account" and that "[a]ccounts with Genesis do not enjoy FDIC protection." Genesis Global Trading, Inc., the SEC registered broker-dealer affiliated with Genesis, did not have a role in the Gemini Earn program. Although Genesis has registered as a money services business ("MSB") with FinCEN, the anti-money laundering and recording keeping and reporting requirements of an

MSB – designed to prevent money services business from being used to facilitate money laundering and the financing of terrorist activities – do not provide the significant disclosures and other investor protections afforded by the federal securities laws.

52.     Similarly, although Gemini is registered with NYSDFS as a New York limited purpose trust company, NYSDFS did not have oversight over Genesis. Gemini publicly stated that Gemini Earn does not operate like a traditional bank account, is not protected by a governmental program, and is not backed by Gemini itself.  In a February 2021 press release launching Gemini Earn, Gemini stated that "Gemini Earn is not a depository account. . . . Loans are not insured by Gemini or any governmental program or institution." Likewise, on its website, Gemini noted that "Gemini Earn is structured similarly to non-deposit services offered by financial institutions and not insured by FDIC, SIPC, any other governmental program, or Gemini."

53.     Any capital reserve requirements applicable to Gemini did not apply to Genesis or to the crypto assets tendered to Genesis through Gemini Earn.

54.     Under the terms of the Gemini Earn Agreement, Genesis was not required to post collateral. Gemini told investors, "All lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit." Although Genesis later provided some collateral to Gemini in August 2022, the collateral Genesis provided to Gemini was in the form of restricted shares that could not be liquidated immediately and amounted to only a fraction of the total investor assets held in Gemini Earn.

55.     As evidenced by the current state of Gemini Earn, where investors have been unable to access their crypto assets or any form of collateral since November 16, 2022, any

oversight of Genesis as an MSB and Gemini as a limited purpose trust company did not

adequately reduce the risk of significant harm to Gemini Earn retail investors.

### B.  The Gemini Earn Program Constituted the Offer and Sale of Investment Contracts under *Howey*

56.     The offer and sale of Gemini Earn Agreements through the Gemini Earn program

also constitutes the offer and sale of investment contracts under *Howey*.

#### 1.  Gemini Earn Involved the Investment of Money

57.     The Gemini Earn program involved an investment of money. Between February

2021 and November 2022, Genesis raised billions of dollars from hundreds of thousands of retail

investors, who tendered crypto assets to Genesis through the program.

#### 2.  Gemini Earn Investors and Defendants Invested in a Common Enterprise

58.     Investors in Gemini Earn invested in a common enterprise with other investors

and with Defendants.

59.     Genesis pooled Gemini Earn investors' and other investors' crypto assets on

Genesis' balance sheet, and used those assets in order to generate returns for both Genesis and

investors, including Gemini Earn investors. Genesis did not manage individual or separate

accounts for each investor in Gemini Earn. Instead, the returns earned by each investor were

reliant on the pooling of the invested crypto assets. As the invested crypto assets were not

segregated in any way by Genesis, each investor's fortune was tied to the fortunes of the other

investors.

60.     Gemini Earn investors' fortunes were also tied to Genesis' fortunes; both Genesis

and Gemini Earn investors earned profits when Genesis deployed the pooled assets. Moreover,

Genesis' current situation, where it has experienced withdrawal requests that exceed its current

liquidity and has consequently restricted Gemini Earn investors from withdrawing their crypto

assets and begun a restructuring process, further demonstrates that the fortunes of Genesis and the fortunes of each Gemini Earn investor are tied to one another in a common enterprise.

### 3. Gemini Earn Investors Reasonably Expected to Profit From the Efforts of Defendants

61.    Investors in the Gemini Earn program reasonably expected to profit from the efforts of Defendants.

62.    From its inception, Defendants have explicitly marketed the Gemini Earn program as an investment opportunity which led investors to reasonably expect to profit from their efforts. As detailed above, through their websites and social media channels, both Genesis and Gemini publicly touted the ability for investors to earn yield or returns via Gemini Earn. Gemini repeatedly itself described Gemini Earn as an investment on its own website; repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and that Gemini Earn investors could "receive more than 100x the national interest rate"; and Gemini's website illustrated how much interest Gemini Earn investors could potentially earn by investing their crypto assets for a period between one and four years.

63.    Genesis also described itself as the "premier institutional digital asset financial services firm," and "the world's largest digital asset lender" and that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." Accordingly, Gemini Earn investors were led to expect that Defendants' efforts to generate the investment returns – *i.e.*, the promised interest – would result in profit for investors.

64.    As part of the Gemini Earn Agreements, investors ceded control over their crypto assets to Genesis, who has complete discretion in deploying the crypto assets. Genesis, not investors, undertook various complex tasks of pooling Gemini Earn crypto assets, identifying Institutional Borrowers to serve as counterparties, negotiating individual agreements with those

18

counterparties, and managing market and counterparty risk. Investors understood that Genesis would conduct due diligence on Institutional Borrowers and evaluate market conditions in determining the appropriate collateral levels.

65.    Moreover, the economic realities of the Gemini Earn program demonstrate that Genesis was motivated to use its experience and skill as the "premier institutional digital asset financial services firm" and its economic power as "the world's largest digital asset lender " to select appropriate Institutional Borrowers to serve as counterparties, negotiate for the highest interest rates from those Institutional Borrowers, and set appropriate collateral levels, in order to generate maximum profit for itself. Defendants' efforts were essential to the success or failure of the enterprise.

66.    Investors understood that, on a monthly basis, the interest rate for their Gemini Earn investments would be revised by Genesis, reflecting Genesis' ongoing managerial efforts to pay among "the highest rates in the market."

67.    Defendants' statements and actions, and the economic reality of the Gemini Earn program, have led reasonable investors to expect Genesis to undertake significant and essential technical, managerial, and entrepreneurial efforts on their behalf, and investors in the Gemini Earn program reasonably expected to profit from those efforts.

### III.   Defendants Have Failed to Register their Offer and Sale of Securities Through Gemini Earn with the Commission

68.    Defendants offered and sold securities through the Gemini Earn program.

69.    Defendants have used interstate commerce to offer and sell securities through Gemini Earn by, among other things, engaging in general solicitation through their websites and other promotional materials, including social media.

70.    Defendants have never had a registration statement filed or in effect with the SEC

for their offers and sales of securities through the Gemini Earn program.

71.     Defendants' public disclosures contained selective or no information about Genesis' financial history, audited financial statements, management discussion and analysis of financial condition and results of operations, and ability to generate profits. Gemini Earn investors also had limited or inadequate information about Genesis' operations, financial condition, liquidity, or other factors relevant in considering whether to invest in the Gemini Earn program. Investors also lacked full and detailed information regarding how Genesis deploys their crypto assets, including its exposure to volatility in crypto asset markets, the financial condition of Genesis' counterparties and the amount of collateral Genesis obtained, if any, as part of its loans to Institutional Borrowers. In short, Gemini Earn investors lacked information that issuers provide under the Securities Act when they solicit public investment.

**CLAIM FOR RELIEF**
**Violations of Section 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**

72.     The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

73.     By virtue of the foregoing, without a registration statement in effect as to that security, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

74.     By engaging in the conduct described above, each Defendant violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)];

### II.

Ordering Defendants to disgorge all ill-gotten gains obtained within the statute of limitations, with prejudgment interest thereon, pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), (7)];

### III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

### IV.

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: January 12, 2023

/s/ Edward J. Reilly
_____
Edward J. Reilly*
Jonathan Austin (SDNY Bar No. JA-2073)
Ashley Sprague
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington, DC 20549
(202) 551-6791 (Reilly)
Email: ReillyEd@sec.gov

*Pending admission pro hac vice

Of Counsel
Stacy Bogert
Deborah A. Tarasevich
James P. Connor