UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

     v.

GENESIS GLOBAL CAPITAL, LLC and GEMINI
TRUST COMPANY, LLC,

        Defendants.

Case No. 23-CV-287 (ER)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT GENESIS GLOBAL CAPITAL, LLC'S
MOTION TO DISMISS THE COMPLAINT OR
<u>STRIKE CERTAIN OF PLAINTIFF'S REQUESTS FOR RELIEF</u>**

Jason Gottlieb
Daniel C. Isaacs
William Roth
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Telephone:  (212) 735-8600
Facsimile:   (212) 735-8708

*Attorneys for Defendant
Genesis Global Capital, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................. 4

    A.   The Parties ................................................................................ 4

    B.   The Gemini Earn Program .................................................................. 5

    C.   The Termination of Gemini Earn and GGC's Chapter 11 Proceedings ................ 7

    D.   The SEC's Claim for Relief ................................................................ 8

LEGAL STANDARD ...................................................................................... 8

ARGUMENT ………………………………………………………………………9

I.     THE GEMINI EARN PROGRAM DID NOT CONSTITUTE AN OFFER AND SALE OF SECURITIES ...................................................................................... 9

    A.   Gemini Earn Loan Agreements Are Not Investment Contracts Under *Howey* ...... 9

          1.   The Complaint fails to allege that Gemini's customers "invested" in a "common enterprise" ................................................................ 9

          2.   The Complaint fails to allege that Gemini Earn customers had any expectation of profits solely from the efforts of either Gemini or GGC .. 11

    B.   Gemini Earn Loan Agreements Are Not Security Notes Under *Reves* ............... 14

          1.   The motivations of the parties were simply to make (and accept) a loan . 15

          2.   The alleged plan of distribution refutes a conclusion that the Loan Agreements were securities .................................................... 18

          3.   The SEC's allegations, and the Loan Agreement itself, confirm that the "expectation of the investing public" was that the Gemini Earn loans were not securities ...................................................................... 19

          4.   Risk mitigation factors, including a regulatory regime, were in place ..... 21

II.    PERMANENT INJUNCTIVE RELIEF AND DISGORGEMENT ARE NOT SUFFICIENTLY ALLEGED ...................................................................... 22

CONCLUSION .......................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*Asset Prot. Plans, Inc. v. Oppenheimer & Co., Inc.*,
    No. 8:11-CV-440-T-23MAP, 2011 WL 2533839 (M.D. Fla. Jun. 27, 2011)....................17–18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...................................................................................................5

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    763 F. Supp. 36 (S.D.N.Y. 1991) ....................................................................................16

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    973 F.2d 51 (2d Cir. 1992)........................................................................................ *passim*

*Benedict v. Amaducci*,
    No. 92 Civ. 5239 (KMW), 1995 WL 413206 (S.D.N.Y. July 12, 1995)...............................19

*C.N.S. Enterprises, Inc., v. G & G. Enterprises, Inc.*,
    508 F.2d 1354 (7th Cir.1975) ..........................................................................................17

*Cooper v. King*,
    114 F.3d 1186 (6th Cir. 1997) ..........................................................................................11

*Costabile v. N.Y.C Health & Hosps. Corp.*,
    951 F.3d 77 (2d Cir. 2020)..................................................................................................8

*Dane v. UnitedHealthcare Ins. Co.*,
    974 F.3d 183 (2d Cir. 2020)...............................................................................................8

*Deckebach v. La Vida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) .....................................................................................10, 13

*Elson v. Geiger*,
    506 F. Supp. 238 (E.D. Mich. 1980)..................................................................................13

*First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A.*,
    919 F.2d 510 (9th Cir. 1990) ..................................................................................3, 12, 22

*In re Genesis Global Holdco, LLC, et al.*,
    Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) ..............................................................5, 7–8

*Glazer v. Abercrombie & Kent, Inc.*,
    No. 07 C 2284, 2009 WL 3060269 (N.D. Ill. Sept. 22, 2009)................................................21

*Harman v. Harper,*
    914 F.2d 262 (9th Cir. 1990) ...........................................................................12–13

*Intelligent Digital Systems, LLC v. Visual Management Systems, Inc.,*
    683 F. Supp. 2d 278 (E.D.N.Y. 2010) .............................................13–14, 17, 21

*Jeanne Piaubert, S.A. v. Sefrioui,*
    No. 97-56131, 2000 WL 194149 (9th Cir. Feb. 17, 2000) ....................................18

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991)...................................................................................5

*LeBrun v. Kuswa,*
    24 F. Supp. 2d 641 (E.D. La. 1998) .....................................................................20

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) .........................................................................................23

*Premier Microwave Corp. v. Comtech Telecomms. Corp.,*
    No. 88 Civ. 2570 (KMW), 1991 WL 12430 (S.D.N.Y. Jan. 28, 1991)..................19

*Reeder v. Succession of Palmer,*
    736 F. Supp. 128 (E.D. La. 1990) ..................................................................19–20

*Resolution Tr. Corp. v. Stone,*
    998 F.2d 1534 (10th Cir. 1993) ............................................................................13

*Revak v. SEC Realty Corp.,*
    18 F.3d 81 (2d Cir. 1994).............................................................................1, 9, 11

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) ........................................................................................ *passim*

*Schorr v. Roberson,*
    319 F. Supp. 3d 226 (D.D.C. 2018) .....................................................................23

*SEC v. Alexander,*
    115 F. Supp. 3d 1071 (N.D. Cal. 2015) ...............................................................24

*SEC v. Boey,*
    No. 07-cv-39-SM, 2013 U.S. Dist. LEXIS 59250 (D.N.H. Jul. 22, 2013) ............22

*SEC* v. *City of Victorville,*
    No. ED CV13-00776 JAK, 2013 WL 12133651 (C.D. Cal. Nov. 14, 2013) ..........22

*SEC v. Commonwealth Chem. Secs., Inc.,*
    574 F.2d 90 (2d Cir. 1978)..............................................................................22–23

*SEC v. Dibella*,
 No. 3:04cv1342 (EBB), 2008 U.S. Dist. LEXIS 109378 (D. Conn. Mar. 13,
 2008) ......................................................................................................................22–23

*SEC v. Fernandez*,
 No. 6:19-CV-1843-RBD-LRH, 2021 WL 6125520 (M.D. Fla. Feb. 22, 2021) ....................24

*SEC v. First Jersey Secs., Inc.*,
 101 F.3d 1450 (2d Cir. 1996) ..............................................................................................23

*SEC v. Norton*,
 No. 95 CIV. 4451 (SHS), 1998 WL 691043 (S.D.N.Y. Sept. 30, 1998) ................................24

*SEC v. Opulentica, LLC*,
 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ...................................................................................22

*SEC v. RG Reynolds*,
 952 F.2d 1125 (9th Cir. 1991) ..............................................................................................21

*SEC v. Steadman*,
 967 F.2d 636 (D.C. Cir. 1992) ..............................................................................................22

*SEC v. Telegram Grp. Inc.*,
 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................................................10

*SEC v. W.J. Howey Co.*,
 328 U.S. 293 (1946) ................................................................................................... *passim*

*Union Nat'l Bank of Little Rock v. Farmers Bank, Hamburg, Ark.*,
 786 F.2d 881 (8th Cir. 1986) ................................................................................................13

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
 651 F.2d 1174 (6th Cir. 1981) ..............................................................................................12

*United Housing Foundation, Inc. v. Forman*,
 421 U.S. 837 (1975) ...............................................................................................................13

*Wilson v. Dantas*,
 746 F.3d 530 (2d Cir. 2014) ....................................................................................................8

## STATUTES & RULES

15 U.S.C. § 77(b)(a)(1) ...............................................................................................................1

Fed. R. Civ. P. 8(a) ...................................................................................................................24

Fed. R. Civ. P. Rules 12(b)(1) ...................................................................................................1

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................1, 8

15 U.S.C. § 77e ...........................................................................................................2, 8

**OTHER AUTHORITIES**

Press Release, SEC, SEC Charges Genesis and Gemini for the Unregistered Offer
    and Sale of Crypto Asset Securities through the Gemini Earn Lending
    Program (Jan. 12, 2023), https://www.sec.gov/news/press-release/2023-7 .............................7

Defendant Genesis Global Capital, LLC ("GGC") respectfully submits this memorandum of law in support of its motion (the "Motion"), under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff Securities and Exchange Commission's ("SEC") Complaint (the "Complaint" or the "Compl."), or in the alternative, to strike the Complaint's prayer for a permanent injunction and disgorgement.[1]

## PRELIMINARY STATEMENT

Not all financial transactions—let alone loans—are securities offerings.  Sometimes, a loan is just a loan.  Under the statutory scheme relevant to this case, the term security means only certain types of instruments, which include, among others, "investment contracts" and security "notes."  *See* 15 U.S.C. § 77(b)(a)(1).

Most contracts are not investment contracts.  An *investment* contract means a specific type of agreement, which must involve a person investing money, in a common enterprise, with an expectation of profits based solely on the efforts of others.  *See SEC v. W.J. Howey Co*., 328 U.S. 293 (1946).  To be an investment contract, the investors' fortunes must be tied together, meaning that there is a pooling of investors' funds, typically with a pro rata distribution or sharing in the profits and losses of the enterprise as a whole.  *See, e.g.*, *Revak v. SEC Realty Corp*., 18 F.3d 81 (2d Cir. 1994).

Likewise, most loans are not securities.  *See Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992).  A loan is not a security when it bears a strong resemblance to other instruments that are not securities, which courts determine by examining the motivation of the parties, the plan of distribution of the financial instrument, the public's expectations, and any risk reducing features.  *See Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990).  Key to

---

[1] GGC also joins in the arguments made by co-defendant Gemini Trust Company, LLC's motion to dismiss the Complaint to the fullest extent applicable to GGC.

characterizing a note as a security is an investment in a business enterprise.  Conversely, where the motivation of lenders and borrowers is just the promotion of commercial or consumer purposes, the loans are not transferrable, and the parties' expectations are that the instruments are not securities, the loans are not securities.  *See Banco Espanol*, 973 F.2d at 55.

In this case, filed two years after the Gemini Earn program first commenced, and months *after* it ceased, the SEC alleges that the loan agreements executed by GGC, Gemini Trust Company, LLC ("Gemini"), and Gemini's customers were somehow both investment contracts *and* security notes, at the same time – a notion of wrongfulness in search of a theory of liability.

Notwithstanding that the Gemini Earn program has been terminated for months, and that GGC is in the midst of complex Chapter 11 proceedings in which the very customers of the Gemini Earn programs are creditors, the SEC has chosen to sue GGC on the premise that the loan agreements associated with the Gemini Earn program were unregistered securities, the offering of which violated federal securities laws.  Whatever the tactical reasons may have been behind the SEC's litigation calculus, the SEC's single claim—for a violation of Section 5 of the Securities Act of 1933—is legally deficient because the Complaint fails to plead facts that would elevate the loan agreements into securities.

The loan agreements were simple lending arrangements, signed by three parties: a participating customer of Gemini Trust Company, LLC ("Gemini") who wished to lend digital assets (as lender), Gemini (as agent for its customers), and GGC (as borrower).  The loan agreements unequivocally and expressly referred to the subject transactions as loans.  Each party expressly agreed that the loans "are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws."  The economics of the transactions were similarly plain:  they were open-term loans, *i.e.*, the customer could call back their loan at any

time.  The SEC has not plausibly alleged facts that would transmogrify these loans into either investment contracts or security notes.

First, the SEC has failed to adequately allege that the loan agreements were investment contracts.  The SEC's allegations—read alongside the actual contract—demonstrate that each Gemini Earn customer agreed to loan their digital assets for an open term—*any amount of time they wished*—in exchange for a market-based rate of interest.  Under the terms of the loan agreement, GGC was obligated to pay those market rates—nothing more, nothing less—regardless of how GGC's own lending business performed.  Gemini Earn customers were thus simply drawn to the promise that they would earn rates that were at the time commercially competitive.  The Complaint does not, because it cannot, allege that each lender was casting its lot with GGC, with its fortunes rising or falling with GGC's profits, or that the lenders were horizontally economically aligned with other lenders—features that are required for investment contracts.

Second, there is no pleaded factual basis for the SEC's alternative theory that the loan agreements were security notes under *Reves*.  Conventional lending agreements do not bear sufficient resemblance to securities as to be deemed security notes.  *See Banco Espanol*, 973 F.2d at 55; *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank*, N.A., No. 17 CIV. 6334 (PGG), 2020 WL 2614765 (S.D.N.Y. May 22, 2020).  The loan agreements here expressly characterized the transaction as a loan, not a security.  The parties were driven by the straightforward economic incentives of lenders earning a reliable, disclosed interest rate (on one hand), and borrowers accessing capital (on the other).  The loan agreements were not transferrable; there was no secondary market for them.  GGC stood behind each loan as principal; Gemini Earn customers' singular motivation was to collect a market rate of interest, and not to place their money at risk in anticipation of profit akin to an investment in GGC as an enterprise.  And Gemini, a trust

3

company, was supervised by its prudential regulator, the New York State Department of Financial Services.  The allegations in the Complaint – the loan agreement, surrounding circumstances, and economics of the transactions – all add up to a non-security loan.

The Complaint suffers from a separate problem as well:  it alleges no facts to support the remedies of a permanent injunction or disgorgement sought by the SEC.  The SEC does not allege any likelihood that the now-shuttered Gemini Earn program will restart, and thus, the SEC's prayer for a permanent injunction lacks basis.  As to disgorgement, the SEC does not plead any "ill-gotten gains" purportedly received through the Gemini Earn program.  The SEC's pleading for disgorgement is jarring, given the pendency of GGC's Chapter 11 restructuring proceedings in this district's Bankruptcy Court.  Any disgorgement (or monetary penalties) would come directly at the expense of GGC's other creditors, including the same exact Gemini Earn customers the SEC has ostensibly brought this action to protect.

The issues presented in this case are not just academic, and not limited to this case.  If the loan agreements here were securities, there would be no principled distinction between *any* type of loan and a security.  It would be the proverbial elephant hiding in a mouse hole.  The SEC's conceptualization of loans would subject vast swaths of lending typically offered to American businesses to the full scope of the federal securities laws, requiring registration of each of them (or requiring that they manage to qualify for one of the few exemptions to registration).  Nothing in the Securities Act of 1933, the Supreme Court decisions interpreting that Act, or their progeny, suggest that the SEC is or should be the general regulator of loans in America.

## STATEMENT OF FACTS

### A.    The Parties

GGC was formed in 2017 as a wholly-owned subsidiary of Genesis Global Holdco, LLC, which in turn is wholly owned by Digital Currency Group, Inc. ("DCG").  Compl. ¶ 16.  Gemini

Trust Company, LLC ("Gemini") was founded in 2017 by Cameron and Tyler Winklevoss, who continue to own and control the company through Winklevoss Capital Fund, LLC.  Compl. ¶ 17.

### B.   The Gemini Earn Program

Since its inception in 2018, GGC's business principally consisted of borrowing digital assets from institutions and other accredited investors, and lending those assets to other institutions and accredited investors.  Compl. ¶ 23.  None of that activity is the subject of the instant case.

In February 2021, GGC began participating in the "Gemini Earn" program.  Compl. ¶ 25. The basic structure of the Gemini Earn program was straightforward.  Gemini's customers, and only its customers, could elect to participate in Gemini Earn.  Compl. ¶ 26.  Gemini aggregated the digital assets of its participating customers, and lent those assets, on the customers' behalf, to GGC.  Compl. ¶ 26.  GGC, in turn, paid a gross market-based interest rate to Gemini.  Gemini drew an agent fee for itself, and paid the remaining interest to its customers.  Gemini, in its sole discretion, calculated its agent fee for each loan, thus controlling the net rates of yield offered to its customers.  Compl. ¶ 28; Declaration of Jason Gottlieb, dated May 26, 2023, Ex. 1 ("Loan Agreement")[2] at 1.

All loans from Gemini customers were "open term," which meant that the customer could terminate all, or a portion of, their loan at any time with no fees.  Compl. ¶ 31.  Gemini customers could loan approximately 50 different cryptocurrencies through the program, which earned customers between 0.45% and 8.05% depending on the asset.  Compl. ¶¶ 29–30.

---

[2]     On this motion, this court "may consider … statements or documents incorporated into the complaint by reference . . .," such as the Loan Agreement.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Moreover, "courts routinely take judicial notice of documents filed in other courts."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), such as the docket of *In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), discussed *infra* at 8.

The terms of the Gemini Earn program were set out in a tri-partite Master Digital Asset Loan Agreement (the "Loan Agreement"), executed by each participating Gemini customer, Gemini, and GGC.  Gottlieb Dec., Ex. 1; *see also* Compl. ¶¶ 3, 26, 31–32, 38.  In pertinent part, the Loan Agreement:

- Defined the "Gemini Earn Platform" as "a service and accompanying user interface offered by [Gemini] whereby a [Gemini customer] may authorize [Gemini], as custodian of Lender's Digital Assets, to negotiate one or more *loan agreements* on [the Gemini customer's] behalf for the purpose of lending certain of [the customer's] Digital Assets to one or more borrowers at the [the customer's] direction."  *See* Gottlieb Dec., Ex. 1 at 2 (emphasis added).

- Described the covered transactions as "Loans" with "Offered Loan Terms" that established "Loan Fees" "based on a monthly interest rate, which may be updated on the first day of each calendar month upon at least five (5) days advance notice by [GGC] to [Gemini]."  *See* Gottlieb Dec., Ex. 1 at 3–5.

- Stated that "Loans will be Open Term Loans unless otherwise specified," and "shall be repaid to a Digital Assets Address provided by [Gemini] within three Business Days after the request by [the customer] …"  *See* Gottlieb Dec., Ex. 1 at 3, 15 (providing that upon termination, "any Loaned assets shall be redelivered immediately and any fees owed shall be payable immediately").

- Stated—in a provision titled "Intent"—that "[e]ach Party agrees that the *Loans are intended to be commercial loans* of Digital Assets *and not securities* under the U.S. federal or state securities laws."  *See* Gottlieb Dec., Ex. 1 at 16 (emphasis added).

Even beyond these specific provisions, the Loan Agreement presented Gemini Earn as a non-securities lending program.  *See generally* Gottlieb Dec., Ex. 1.

Although GGC is alleged to have "pooled" the crypto assets it received from Gemini Earn customers on its balance sheet (Compl. ¶ 38), and "deployed" the assets on its balance sheet by either lending them to institutional borrowers or using them as collateral for GGC's own borrowing (Compl. ¶ 39), GGC was obligated to repay Gemini Earn customers' principal and yield based on the "gross interest rate that it paid for each crypto asset" (Compl. ¶ 28), regardless of how GGC's own lending business performed over any given period.

Gemini, and not GGC, ran the customer-facing operations of the Earn program.  Gemini acted as the agent for Earn customers and handled customer operations (Compl. ¶¶ 31–22); Gemini placed customer funds with Genesis (Compl. ¶¶ 26, 31); Gemini was responsible for all terms of service and disclosures, including listing which digital assets were eligible under the program (Compl. ¶ 29); Gemini was responsible for all marketing, including the marketing alleged by the SEC to be indicia of the Earn loans qualifying as securities (Compl. ¶¶ 34–37); and Gemini chose the interest rates paid to Earn customers.  GGC, meanwhile, did not market the Earn program (*see* Compl. ¶ 33), and only calculated the interest paid *to Gemini* (Compl. ¶ 28).  Additionally, Gemini is registered as a New York limited purpose trust company with the New York State Department of Financial Services, its prudential regulator.  *See* Compl. ¶¶ 17, 52.

### C.    The Termination of Gemini Earn and GGC's Chapter 11 Proceedings

As the SEC has acknowledged, the Gemini Earn program ceased *before* the SEC filed its Complaint.  Compl. ¶ 8; *see also* Press Release, SEC, SEC Charges Genesis and Gemini for the Unregistered Offer and Sale of Crypto Asset Securities Through the Gemini Earn Lending Program (Jan. 12, 2023), https://www.sec.gov/news/press-release/2023-7 ("Gemini terminated the Gemini Earn program earlier this month.").

On January 19, 2023, one week after the SEC filed its Complaint, GGC and two affiliated debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in this district.  *See In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.).  While the SEC alleges that Gemini Earn customer assets have not been returned because of "volatility in the crypto asset market" (Compl. ¶ 7), the Complaint omits key details surrounding that "volatility," namely the unforeseen collapse of two of GGC's largest institutional counterparties, Three Arrows Capital and FTX/Alameda. *See, e.g.* Declaration of A. Derar Islim in Support of First Day Motions and Applications in

7

Compliance with Local Rule 1007-2 (ECF No. 17), *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063, at ¶¶ 27–40.  As of the time of this writing, GGC's Chapter 11 proceeding remains pending.

### D.     The SEC's Claim for Relief

The SEC brings a single claim, that Gemini and GGC violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. 77e(a) and 77e(c), by selling or offering the Loan Agreements, and seeks a permanent injunction, disgorgement, prejudgment interest, and civil money penalties.

## LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the complaint must include enough facts to state a claim to relief that is plausible on its face." *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (citation and internal quotation marks omitted).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  "Although all allegations contained in the complaint are assumed to be true, this tenet is inapplicable to legal conclusions." *Id.* (citation and internal quotation marks omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020) (citation omitted).  Although the court is "obligated to draw the most favorable inferences that plaintiff's complaint supports, [the court] cannot invent factual allegations that he has not pled." *Costabile v. N.Y.C Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (citation omitted).

## ARGUMENT

### I.    THE GEMINI EARN PROGRAM DID NOT CONSTITUTE AN OFFER AND SALE OF SECURITIES

The Complaint should be dismissed because the now-defunct Gemini Earn program was nothing more than a lending arrangement.  As that arrangement is alleged in the Complaint, neither the Loan Agreements, the loans individually, nor the loans grouped as a whole amounted to a securities offering.

The SEC has alleged that the Loan Agreements are "securities" under two Court-developed tests:  the *Howey* test for "investment contracts" set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and the "family resemblance test" for "notes" set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  The Loan Agreements did not constitute an offer and sale of securities under either *Howey* (as investment contracts) or *Reves* (as security notes).

#### A.    Gemini Earn Loan Agreements Are Not Investment Contracts Under *Howey*

Under *Howey*, an instrument is an "investment contract" where there is (1) an investment of money, (2) in a common enterprise, (3) in which the purchaser has a reasonable expectation of profits, (4) with such profits derived solely from the efforts of others.  328 U.S. at 299.  Here, the Complaint and Loan Agreement show that Gemini's customers lent digital assets to GGC in an amount and on a timetable of their choosing, outside the context of a common enterprise, and without any expectation of sharing in the profits of Gemini or GGC's efforts.  The SEC has alleged loans, but not securities.

##### 1.    The Complaint fails to allege that Gemini's customers "invested" in a "common enterprise"

In the Second Circuit, a "common enterprise" can only be satisfied by demonstrating horizontal commonality—that "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole."  *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994).

Here, each Earn customer's fortunes were not "tied to the fortunes of the other investors." Rather, they were based on receipt of pre-determined, contractual rates of interest.  Interest paid to Earn customers was based solely on the negotiated and fixed loan terms agreed to by GGC and the Earn customer at the outset.  *See* Compl. ¶¶ 27–30.  Earn customers did not earn profit in an amount that was based on the returns that GGC generated in its lending business, or share in the profits or losses with GGC or any other Earn customer on a *pro rata* basis.  Earn customers were not entitled to capital appreciation resulting from the loan, or a participation in earnings resulting from GGC's use of the assets that were lent.  They received a market rate of interest, and nothing more.  *See id.*

The Loan Agreement treated every loan from an Earn customer as an obligation of GGC, independent of any potential losses that GGC may suffer with respect to loans that it made to its borrowers.  *See id.*  Earn customers took no risk on the counterparties to which GGC lent, or GGC's other business enterprises.  Nor were they entitled to a return based on GGC's profits.  In other words, Earn customers did not have the skin in the game that defines a common enterprise. *See, e.g.*, *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 282 (6th Cir. 1989) (finding there was no common enterprise where "[t]here was no pooling of profits or proration of losses among the yacht owners under the management agreement with La Vida.")

While the Complaint alleges that "both Genesis and Gemini Earn investors earned profits when Genesis deployed the pooled assets," *see, e.g.*, Compl. ¶¶ 59–60, the mere asset aggregation that occurred in the Gemini Earn program is legally insufficient.  Unlike cases where "investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise," *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020), the Complaint here fails to allege how GGC's efforts increased the value or

expected return of the investment, beyond the conclusory allegation that GGC "deployed the pooled assets." Compl. ¶ 60. Without more, there are no allegations of the shared fortune that defines common enterprises. *See, e.g.*, *Cooper v. King*, 114 F.3d 1186 (6th Cir. 1997) ("The mere fact that funds of investors, such as Plaintiffs, were co-mingled in a single bank account does not render this transaction a security.").

Finally, Earn customers were not aligned with one another economically. Each customer was treated separately. Every loan stood on its own, per the Loan Agreement. *See* Compl. ¶ 26; Gottlieb Dec., Ex. 1. And the fact that two loans might be made to the same company does not transmogrify the Loan Agreements into securities.

The SEC's legal theory is out of step with *Howey* and its progeny. It is not enough merely to assert that "the fortunes of each investor 'depend[s] upon the profitability of the enterprise as whole,'" *see* SEC Response to GGC's Pre-Motion Conference Letter, dated May 9, 2023 (ECF No. 26) (citing *Revak*, 18 F.3d 81). *Revak*, which found that a common agency arrangement was *not* a securities offering, explicitly instructs that "[i]f a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry." 18 F.3d at 88. As with the agreements in *Revak*, where "[t]he rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner," *id.*, each loan here stands on its own, with each loan having its own separate terms.

## 2.   The Complaint fails to allege that Gemini Earn customers had any expectation of profits solely from the efforts of either Gemini or GGC

The SEC's allegations that the "returns of Gemini Earn investors were dependent on Genesis' managerial efforts and risk management in its lending activities" (Compl. ¶ 41) is not the

type of "efforts of others" contemplated under *Howey*.  Only one variable dictated how "profitable" the Loan Agreement was for each customer—the market-based interest rate that GGC promised to pay as the principal on each Loan Agreement.  *See* Compl. ¶ 27; Gottlieb Dec., Ex. 1 at 5.  After a customer, Gemini, and GGC executed a Loan Agreement, GGC's "managerial efforts and risk management" made no difference in how much those customers were entitled to receive in exchange for lending their digital assets.  To the contrary, GGC's obligations to Gemini Earn customers were contractual promises to pay an interest rate, established and locked at the first of every month, regardless of how Gemini or GGC's business performed.  *See* Compl. ¶ 27; Gottlieb Dec., Ex. 1 at 5.

Critically, the SEC does not allege that Gemini Earn customers had any entitlement to capital appreciation resulting from their initial loan, or that they shared in the earnings that flowed from GGC's deployment of their assets.  These facts are on all fours with cases where courts have rejected a finding that a given instrument comprised an investment contract.  *See Harman v. Harper*, 914 F.2d 262, *5 (9th Cir. 1990) ("after the notes were purchased, the Harpers' efforts could not and did not make any difference."); *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A.*, 919 F.2d 510, 516 n.6 (9th Cir. 1990) (holding that neither loan participation agreement nor underlying note were "investment contracts" under Arizona securities law where Loan participation agreement under which savings and loan association agreed to provide certain percentage of development loan for agreed rate of interest, subject to all of specified rights and obligations found in loan documents between principal, a commercial bank, and borrower).

The Gemini Earn loan rates constituted the floor and the ceiling of what customers expected to earn.  Such an arrangement is consistent with arms-length lending activity, rather than an investment in a common enterprise. *See Union Planters Nat'l Bank of Memphis v. Com. Credit*

*Bus. Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981) ("The profit which would accrue to the Bank in the form of interest earnings was contingent only upon the passage of time, and was not of a different nature than in a commercial lending transaction."); *Deckebach*, 867 F.2d at 282, *Union Nat'l Bank of Little Rock v. Farmers Bank, Hamburg, Ark.*, 786 F.2d 881, 884–85 (8th Cir. 1986) (finding there were no profits derived from the entrepreneurial or managerial efforts of others where "Union had no prospect of capital appreciation or profit from any increased earnings in the business … Union's return was based solely upon Tucker Oil's ability to repay the loan"); *Resolution Tr. Corp. v. Stone*, 998 F.2d 1534 (10th Cir. 1993) (holding that EARs were not "investment contracts" that would qualify as "securities" under Securities Act where holder received specified interest payments from its investment in EARs, rather than dividends tied to profitability of seller or any other entity).

Finally, the Complaint's reliance on GGC's restructuring process and Gemini Earn participants' current inability to access their loaned assets to bootstrap a claim of a common enterprise is misplaced. *See* Compl. ¶ 60. The SEC also improperly equivocates insolvency risk with investment risk. A loan that is made with the expectation that the borrower would remain solvent in order to repay the principal and interest is <u>not</u> the same as an investment "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *See, e.g.*, *Elson v. Geiger*, 506 F. Supp. 238, 241–242 (E.D. Mich. 1980) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847–48 (1975)). Rather, an interest in a firm's solvency is distinct from a dependence on that firm's efforts and performance for purposes of *Howey*. *See Harper*, 914 F.2d at 262 (citing *Elson*, 506 F. Supp. at 242 ("While the repayment of the mortgage may have depended on the solvency of the borrower, this is not the same as depending on entrepreneurial efforts")); *see also Intelligent Digital Systems, LLC v. Visual*

13

*Management Systems, Inc.*, 683 F. Supp. 2d 278 (E.D.N.Y. 2010) (describing a non-security note, and observing "[w]hile payment might not, as here, be made in the event of a default, that default is not something that is unique to any 'investment-like' character of the asset purchase, but is a risk attendant to any sale.").

All loans necessarily involve counterparty insolvency risk, and hence it is not an analytically salient feature to distinguish loans from investment contracts.  Indeed, if *Howey*'s "common enterprise" and "expectation of profits" prongs were collapsed into the mere expectation that a borrower remain solvent, <u>every</u> commercial lending arrangement would become an offer and sale of securities, because if a company entered Chapter 11, its fortunes would be, in some way, tied to that of its lender.  The same would apply to any supplier agreement and any other sales arrangement where payment occurs sometime after delivery.  That has never been the law, and holding otherwise would re-characterize and impermissibly impose a burdensome securities regulation regime on garden-variety commercial lending and beyond.

### B.   Gemini Earn Loan Agreements Are Not Security Notes Under *Reves*

The SEC also fails to allege that the Gemini Earn program constituted an offer or sale of security notes.  Even if the loans at issue were characterized as "notes," a note is not a security if it is one of the types of "non-security notes" identified in *Reves* (collectively, the "Non-Security Notes"), or if it bears a "strong family resemblance" to the Non-Security Notes.  *Reves*, 494 U.S. at 64–65.

In *Reves*, the Supreme Court established a four-part inquiry to determine whether a note bears a "strong family resemblance" to a Non-Security Note.  Under that framework, a note is presumed to be a security unless it bears a strong resemblance to instruments that are not securities, determined by reference to four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative

regulatory regime that "significantly reduces the risk of the instrument" for investors other than the securities laws, "thereby rendering application of the Securities Acts unnecessary." 494 U.S. at 64–69.   Under *Reves,* the Loan Agreements are, as a matter of law, nothing more than commercial or consumer loan activity.

### 1. The motivations of the parties were simply to make (and accept) a loan

The first factor under *Reves* examines the objective "motivations that would prompt a reasonable seller and buyer to enter into the transaction." *Reves*, 494 U.S. at 66. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate," then a note is more like a security. *Reves*, 494 U.S. at 66. Alternatively, a note primarily intended for a "commercial or consumer purpose" will "less sensibly [be] described as a 'security.'" *Reves*, 494 U.S. at 66. It is not enough that a counterparty merely seeks to earn a profit from a loan. *See generally Banco Espanol,* 973 F.2d at 55 (where one party sought short-term credit while another sought profit, the note was not a security).

Here, the motivations of Gemini Earn customers are consonant with loans and commercial lending arrangements, and not securities. As alleged, Gemini Earn customers were motivated by, and expected to collect, a reasonable, market rate of interest, and not to speculate on GGC's business enterprise or business acumen. *See* Compl. ¶¶ 27–30. The demand for open-term loans through the Gemini Earn program—redeemable for full value at any time—did not reflect a confidence in GGC's corporate vision for the future, but rather a desire for attractive and market-based yield that was *not* contingent on any appreciation in GGC's value. *See* Compl. ¶ 31. It cannot be understated that the open term nature of the loans confirms that they are short-term and commercially motivated transactions, and not a long-term profit or capital investment in GGC.

Put differently, the fact the loans to GGC were redeemable on demand materially distinguishes them from traditional lending *investments* that may constitute security notes under *Reves*.

As noted above, the Loan Agreement also treated every loan from an Earn customer as an obligation of GGC independent of any gains or losses that GGC may have enjoyed or suffered. Earn customers were not sharing in the spoils of GGC's business, and were not entitled to a return based on GGC's profits from its activities. *See* Compl. ¶¶ 27–31.

*Banco Espanol* is highly instructive. In *Banco Espanol*, the court analyzed whether customer agreements to participate in Security Pacific's short-term loan program constituted security notes under *Reves*. *See* 973 F.2d 51, 55 (2d Cir. 1992). Like the yield rates offered in the Gemini Earn program, the loan in *Banco Espanol* "offered yields superior to comparable money market instruments for placement of the participant's excess cash at interest, such as in Federal Funds, Commercial Paper, Certificates of Deposit or Eurodollar Deposits." *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 39 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992). Against this backdrop, the trial court reasoned that "the overall motivation of the parties was the promotion of commercial purposes and not investments in a business enterprise":

> Self-evidently, [Security Pacific's customer's] motivation was to have access to a source of short-term funds that was competitive with alternative short-term money market instruments to finance current operations or to cover a temporary cash shortage. The motivation of the participant in buying all or part of the loan was to use its excess cash by purchasing a short-term vehicle that would earn a fixed rate of interest that was higher than alternative money market instruments. Thus, the overall motivation of the parties was the promotion of commercial purposes and not investments in a business enterprise.

*Id*. at 42-43. The Second Circuit affirmed, noting that "purchasers of the loan participations sought a short-term return on excess cash." *Banco Espanol*, 973 F.2d at 55.

Like the lenders in *Banco Espanol*, Gemini customers who agreed to participate in the Gemini Earn program were motivated to receive guaranteed and commercially reasonable yield,

not subject to contingency, and not to invest in the long-term growth of GGC or Gemini.  Indeed, as the SEC alleges, before they even enrolled in the program, Gemini customers could estimate exactly how much interest they would earn (regardless of how GGC performed).  *See* Compl. ¶ 50 ("Gemini's website also included a calculator that showed a user potentially how much interest they could earn by investing their crypto assets in the Gemini Earn program for a period between one and four years.").  While the Complaint alleges in conclusory fashion that Gemini customers "were primarily motivated to earn a profit" and "participated in the Gemini Earn program primarily for profit, *i.e.* to receive a return on their crypto assets" (Compl. ¶¶ 47–48), the Complaint fails to distinguish their motivations from the motivations of *any* lender.  As the Seventh Circuit observed on similar facts, "[i]n one sense *every lender* of money is an investor since he places his money at risk in anticipation of a profit in the form of interest," *C.N.S. Enterprises, Inc., v. G & G. Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.1975) (emphasis added); *see also Intelligent Digital Sys.*, 683 F.Supp.2d at 284 (holding a note is not a security where the "motivation of the seller is not to invest in the future success of the buyer, where the price to be paid might vary along with the success, or lack thereof, of the buyer's business. Instead, the amount to be paid is contractually established, and must be paid . . . ."); *Asset Prot. Plans, Inc. v. Oppenheimer & Co., Inc.*, No. 8:11-CV-440-T-23MAP, 2011 WL 2533839, at *3 (M.D. Fla. Jun. 27, 2011) (relying on *Banco Espanol* and *C.N.S. Enterprises* to hold that certain notes that were to be repaid without any contingency were "most fittingly conceived as a loan").

Additionally, the Loan Agreements were not transferrable or assignable, and not susceptible to being freely traded or used for profit seeking on the secondary market.  *See* Gottlieb Dec., Ex. 1 at Section XVII.  The rates of interest offered to Gemini Earn customers were also market rate, reset on a set schedule to match the market, and not so high as to imply or suggest an

investment purpose.  *See* Compl. ¶¶ 27, 30; *Jeanne Piaubert, S.A. v. Sefrioui*, No. 97-56131, 2000 WL 194149, at *3 (9th Cir. Feb. 17, 2000) ("Although the Limited Partnership, as the seller, may well have intended to raise general operating funds, no reasonable buyer would have been interested primarily in the profit the 6% note-as opposed to the Limited Partnership itself-would generate."); *Banco Espanol*, 973 F.2d at 55 (noting that "traditional loan participations do not qualify as securities" and that the district court correctly found that "the motivation of the parties was the promotion of commercial purposes" where one party wanted "short-term credit … to finance its current operations" and the other "sought a short-term return on excess cash"); *Asset Prot. Plans, Inc.*, 2011 WL 2533839 at *3 (finding that fixed-rate demand loan agreements, expressly describing the transaction as a loan, were not securities).

### 2.    The alleged plan of distribution refutes a conclusion that the Loan Agreements were securities

Even if the tri-partite Loan Agreements could be considered a "distribution" at all, by design, and under the terms of each Loan Agreement, the loans were only offered to existing Gemini customers and had no secondary market.  *See* Compl. ¶ 26 ("Gemini Earn investors first needed to hold eligible crypto assets with Gemini ….").  Hence, the plan of distribution was limited; GGC borrowed only from Gemini customers, who have passed through Gemini's onboarding process, which process would necessarily have been subject to approval by Gemini's prudential regulator, NYDFS.  Compl. ¶ 26.  There was an existing commercial relationship and a commercial purpose between Gemini Earn customers, on the one hand, and Gemini and GGC, on the other hand.  *See* Gottlieb Dec., Ex. 1 at 13 (providing that "no Party may assign this Agreement or any rights or duties hereunder without the prior written consent of [Gemini and GGC]").

Similarly, each Loan Agreement was for a specific customer signatory, and no one else. There was no common trading of the Loan Agreements for speculation or investment purposes.

Non-transferrable notes of this kind are routinely held to be non-securities, including in *Banco Espanol* itself. *See Banco Espanol*, 973 F.2d at 55 (holding that short-term loan participations sold by bank were not "securities" within meaning of Securities Act; among other features, only institutional and corporate entities were solicited by bank, and the instruments specifically prohibited resales); *Benedict v. Amaducci*, No. 92 Civ. 5239 (KMW), 1995 WL 413206, at *10 (S.D.N.Y. July 12, 1995) (granting motion to dismiss complaint and holding notes were not securities because the plaintiff "d[id] not allege any plan of distribution for the notes, and there was no public expectation that the notes would be traded as securities") (internal quotation marks and citation omitted); *Premier Microwave Corp. v. Comtech Telecomms. Corp.*, No. 88 Civ. 2570 (KMW), 1991 WL 12430 (S.D.N.Y. Jan. 28, 1991) (granting motion for summary judgment dismissing the complaint and holding that note was not security in the absence of distribution plan and public expectation that note would be traded).

3.      **The SEC's allegations, and the Loan Agreement itself, confirm that the "expectation of the investing public" was that the Gemini Earn loans were not securities**

The SEC alleges no facts that suggest that the investing public would have expected that their loans were securities. There is no secondary market for the Loan Agreements. The lack of free assignment and transfer rights establish that the loans are not for open trading or profit-seeking (beyond receipt of a market rate of interest). The interest rates are not so high as to suggest an investment in GGC's growth as a company, or to reward or induce risk-taking or speculation in GGC's own business enterprise. *See* Compl. ¶ 30. Since the Loan Agreements "were not commonly traded" and there was no secondary market, "it is unnecessary to examine the reasonable expectation of the investing public," and *Reves*' third prong must be weighed against a finding that the agreements were securities. *Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La. 1990), *aff'd sub nom. Reeder v. Palmer*, 917 F.2d 560 (5th Cir. 1990).

Moreover, even assuming that Gemini Earn customers could stand in for "the investing public," there is no basis to infer that they expected to transact in securities. *See id.* at 129, 131 (holding that payments made to participants in an alleged Ponzi "travel club" were not securities under *Reves* where participants were promised a 6% return per month and their "only expectation could be that of loan repayment with a fixed – albeit high – rate of interest."). Here, the SEC's Complaint alludes to Gemini's marketing campaign to suggest that the Loan Agreements were securities. *See* Compl. ¶¶ 33–37, 50. But the Loan Agreements, to which each customer agreed, expressly stated "the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws." *See* Gottlieb Dec., Ex. 1 at 16 (emphasis added). Given such express language, no Gemini Earn participants would or could have had the "reasonable expectation" that their participation in the program involved securities.

The structure and language of the Loan Agreements confirm that the parties were agreeing to a commercial lending relationship, and committing to paying (and receiving) advertised interest rates. *See id.*, Ex. 1 at 2–5. This kind of unequivocal language is inconsistent, as a matter of law, with the conclusions that Gemini Earn customers plausibly had any expectation that they were transacting in securities, or placing assets at risk for anything beyond the advertised yield. Thus, the SEC's invitation for the Court to retroactively supplant the express understanding of the parties, and the "economic realities" of the transaction (*Reves*, 494 U.S. at 62, 67), with the SEC's baseless speculation should be rejected. *See Banco Espanol*, 973 F.2d at 55 (holding instruments were not securities where, among other things, the institutions who purchased the loan participations "were given ample notice that the instruments were participations in loans and not investments in a business enterprise"); *Kirschner,* 2020 WL 2614765 at *9 ("the Credit Agreement and CIM would lead a reasonable investor to believe that the Notes constitute loans, and not securities."); *LeBrun*

*v. Kuswa*, 24 F. Supp. 2d 641, 648 (E.D. La. 1998) ("After the fact recharacterizations cannot affect this prong").  In sum, none of the circumstances alleged in the Complaint support a plausible inference that Gemini Earn customers would believe the Loan Agreements were securities.

### 4.   Risk mitigation factors, including a regulatory regime, were in place

The last *Reves* factor analyzes whether any additional factors significantly reduce the risk relating to the instrument, hence bearing more of a resemblance to a Non-Security Note.  *Reves*, 494 U.S. at 69.  Because the first three factors weigh so heavily against a finding that the Loan Agreements are securities notes, "the court need not consider the fourth factor."  *Intelligent Digital Sys.*, 683 F. Supp. 2d at 285.

In any event, as the SEC acknowledges, "Gemini is registered with the NYSDFS as a New York limited purpose trust company."  Compl. ¶ 52.  NYSDFS supervises and regulates the activities of New York financial institutions, such as Gemini.

Furthermore, other risk-reducing features were present in the Gemini Earn program.  GGC backed all loans as principal, and the Loan Agreement confirms that lenders are not taking risk based on the quality of GGC's loans to others.  *See* Gottlieb Dec., Ex. 1.  GGC is based in New Jersey, and contract law and other state consumer protections and common law provides GGC's counterparties with "additional avenues of protection."  *See e.g.*, *Glazer v. Abercrombie & Kent, Inc.*, No. 07 C 2284, 2009 WL 3060269, at *9 (N.D. Ill. Sept. 22, 2009).  Moreover, the Loan Agreements established that all loans were open-term instruments (Compl. ¶ 31), and that Gemini Earn customers could reclaim their assets on a discretionary basis, further lessening the need for a regulatory scheme.  *SEC v. RG Reynolds*, 952 F.2d 1125 (9th Cir. 1991) (acknowledging that "the longer one's funds are to be used by another, the greater risk of loss").

In short, the SEC fails to adequately allege that the Loan Agreements constituted either investment contracts under *Howey* or security notes under *Reves*.  Accordingly, the Complaint should be dismissed against GGC.

## II. PERMANENT INJUNCTIVE RELIEF AND DISGORGEMENT ARE NOT SUFFICIENTLY ALLEGED

Even if the Court found that the Complaint has sufficiently alleged that the Loan Agreements could constitute investment contracts or security notes, the Court should nonetheless strike the SEC's prayer for a permanent injunction and disgorgement.

Improper prayers for relief may be subject to a motion to strike if the complaint fails to allege facts supporting the plaintiff's entitlement, as a matter of law, to the requested relief.  *SEC v. City of Victorville*, No. ED CV13-00776 JAK (DTBx), 2013 WL 12133651, at *13 (C.D. Cal. Nov. 14, 2013) (striking SEC's disgorgement remedy) (citing cases).

*First,* the SEC fails to allege any basis for a permanent injunction against GGC.  "A permanent injunction is a drastic remedy and should not be granted lightly, *especially when the conduct has ceased.*"  *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (emphasis supplied).  Thus, as the court in *SEC v. Boey*, No. 07-cv-39-SM, 2013 U.S. Dist. LEXIS 59250 (D.N.H. Jul. 22, 2013), summarized:

> "There must be 'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'"  Although "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations," *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007), … the SEC must "go beyond the mere facts of past violations and demonstrate a *realistic* likelihood of recurrence."  *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978).

*Boey,* 2013 U.S. Dist. LEXIS 59250, at *8–9 (quoting *SEC v. Dibella*, No. 3:04-cv-1342 (EBB), 2008 U.S. Dist. LEXIS 109378, at *12 (D. Conn. Mar. 13, 2008) (cleaned up)).   Here, the SEC has (1) acknowledged that "the Gemini Earn program has been terminated" (Compl. ¶ 8), but (2)

alleged nothing in the remainder of the Complaint that evinces that there is a realistic likelihood of recurrence. *Commonwealth Chem. Secs., Inc.*, 574 F.2d at 99. Thus, the SEC's request for a permanent injunction should be stricken.

The Complaint's single allegation relating to any putative need for an injunction fails. The SEC claims that GGC "intends to reengage in crypto asset lending activities" in the future (Compl. ¶ 8)—unspecified activity which may or may not include any activity similar to the Earn Program. But such speculative and vague allegation of some future intent of a non-specific activity does not allege any "cognizable danger of recurrent violation." *See Dibella*, 2008 U.S. Dist. LEXIS 109378, at *12; *cf. Schorr v. Roberson*, 319 F. Supp. 3d 226, 230 (D.D.C. 2018) (reasoning that injunctive relief based solely on hypothetical reinstatement of prior violations is not warranted). Simply put, there is no basis for a permanent injunction here.

*Second,* the SEC does not allege a claim for disgorgement, which cannot "exceed a wrongdoer's net profits," and "is awarded for victims is equitable relief under § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). The SEC is also required to provide "a reasonable approximation of profits causally connected to the violation." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).

After its multi-year investigation, the SEC still has failed to put forth any allegations as to what net profits GGC should disgorge or return as a result of the violations alleged in the Complaint. The SEC refers to disgorging ill-gotten gains in just two places in the Complaint: in the identification of a litany of relief sought and in the prayer for relief section. Compl. ¶ 12, at 21 (Prayer for Relief, II). Neither of these conclusory allegations provide any facts to establish whether GGC received any "ill-gotten gains" or "net profits" as a result of the Gemini Earn program. Nor do such conclusory allegations plausibly support any disgorgement theory.

Merely reciting an estimate of how much GGC earned from "Institutional Borrowers" in a three-month period in 2022 (*see* Compl. ¶ 42) is not a substitute for providing what the Supreme Court and the Second Circuit require of the SEC for disgorgement. And such recitation fails to provide GGC with the required notice of the SEC's legal or factual basis for such claim, consistent with Rule 8's notice pleading standard.  Fed. R. Civ. P. 8(a).  Even where plaintiffs have cited more precise estimates of gains allegedly resulting from misconduct, courts have required more than the SEC has provided here.  *See SEC v. Fernandez*, No. 6:19-CV-1843-RBD-LRH, 2021 WL 6125520, at *3 (M.D. Fla. Feb. 22, 2021) ("Upon consideration, the Court is not convinced that a sole citation to an allegation in the complaint that 'Fernandez misappropriated at least $1.65 million of investors' funds' is sufficient to carry the SEC's burden of providing 'a reasonable approximation of [Mr. Fernandez's] ill-gotten gains.'").

Accordingly, the court should strike the SEC's unfounded request for disgorgement, which, in any event, could only come at the expense of the creditors in the GGC Chapter 11 proceedings, including the Gemini customers.  *See SEC v. Norton*, No. 95 CIV. 4451 (SHS), 1998 WL 691043, at *5 (S.D.N.Y. Sept. 30, 1998) (dismissing claim for disgorgement on summary judgment where the "SEC has made no other showing that Tartaglia received any ill-gotten gains"); *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1088 (N.D. Cal. 2015) (Plaintiff's single statement that Defendants "financed their personal and unrelated business' expenses" is insufficient to establish that disgorgement of the total funds raised is required as a matter of law).

## <u>CONCLUSION</u>

For the foregoing reasons, GGC respectfully requests that the Court dismiss the Complaint in its entirety against GGC, or, in the alternative, strike the SEC's requests for a permanent injunction and disgorgement, and grant such other and further relief as is just and proper.

Dated: New York, New York
      May 26, 2023

MORRISON COHEN LLP

By:   /s/ *Jason Gottlieb*
      Jason Gottlieb
      Daniel C. Isaacs
      William Roth
      909 Third Avenue
      New York, New York 10022
      (212) 735-8600

*Attorneys for Defendant Genesis Global Capital, LLC*

25