**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 23-cv-287 (ER) |
| v. | |
| GENESIS GLOBAL CAPITAL, LLC and GEMINI TRUST COMPANY, LLC, | |
| Defendants. | |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................. 1

**SUMMARY OF THE ALLEGATIONS** ...................................................... 2

**LEGAL STANDARD** ................................................................................ 4

**ARGUMENT** .............................................................................................. 4

I.      The Complaint Sufficiently Alleges That Gemini Earn Constitutes An
        Investment Contract Under Howey .................................................................. 4

        A.      The Complaint Alleges That Gemini Earn Investors Participated In
                A Common Enterprise Through Horizontal Commonality ...................... 5

        B.      The Complaint Alleges That Gemini Earn Investors Participated In
                A Common Enterprise Through Strict Vertical Commonality .................. 9

        C.      The Complaint Alleges That Reasonable Investors Expected
                Profits in Gemini Earn to Come from Defendants' Managerial
                Efforts ................................................................................................ 10

II.     The Complaint Sufficiently Alleges an Offer and Sale of Securities Under
        *Reves* ......................................................................................................... 13

        A.      The Complaint Sufficiently Alleges that the Motivations of
                Defendants and the Gemini Earn Investors Demonstrate that the
                Gemini Earn Agreements were Securities Notes .................................. 13

        B.      The Complaint Adequately Alleges a Plan of Distribution
                Sufficient to Establish a Securities Offering ....................................... 17

        C.      The Complaint Adequately Alleges that the Expectations of the
                Investing Public were that the Gemini Earn Notes were
                Investments ......................................................................................... 18

        D.      The Complaint Adequately Alleges that No Alternative Regulatory
                Regime or Risk-Reducing Factors Exist to Protect Gemini Earn
                Investors .............................................................................................. 21

III.    The Complaint Alleges A Prima Facie Claim Under Section 5, including
        Offers and Sales of Securities ...................................................................... 23

        A.      The Complaint Properly Alleges Offers and Sales of Securities
                Through Gemini Earn ........................................................................... 23

        B.      Defendants' Hypertechnical Arguments Regarding When
                Investors' Assets "Changed Hands" Lack Merit and Conflict with
                Well-Established Precedent .................................................................. 26

IV.     The Complaint Sufficiently Alleges A Basis for Injunctive Relief and
        Disgorgement ............................................................................................... 28

**CONCLUSION** ....................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 301 (S.D.N.Y. 2010) .............................................................................. 28

*Arthur Young & Co. v. Reves*,
    856 F.2d 52 (8th Cir. 1988) ............................................................................................. 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 ...................................................................................................................... 4

*Asset Prot. Plans, Inc. v. Oppenheimer & Co., Inc.*,
    No. 8:11-CV-440-T-23MAP, 2011 WL 2533839 (M.D. Fla. Jun. 27, 2011) .................. 15

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................................... 7

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    763 F. Supp. 36 (S.D.N.Y. 1991) .................................................................................... 16

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    973 F.2d 51 (2d Cir. 1992) ...................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................... 4

*Bongiorno v. Baquet*,
    No. 20-CV-7288 (LJL), 2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021) .......................... 19

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ............................................................................................. 4

*Chris-Craft. Indus. v. Bangor Punta Corp.*,
    426 F.2d 569 (2d Cir. 1970) ........................................................................................ 26-27

*SEC v. First Jersey Secs., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) .......................................................................................... 29

*Deckeback v. LaVida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) ............................................................................................. 7

*Digital Systems, LLC v. Vis Management Systems, Inc.*,
    683 F. Supp. 2d 278 (E.D.N.Y. 2010). ........................................................................... 15

*SEC v. Drake*,
No. 2:17–cv–06204–CAS (GJSx), 2017 WL 6507766 (C.D. Cal. Dec. 18, 2017) .......... 29

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d. Cir. 2009).................................................................................... 24

*Elson v. Geiger*,
506 F. Supp. 238 (E.D. Mich. 1980)........................................................................ 10

*Finkel v. Stratton Corp.*,
962 F.2d 169 (2d Cir. 1992).................................................................................... 27

*First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A.*,
919 F.2d 510 (9th Cir. 1990) ............................................................................. 12-13

*Fragin v. Mezei*,
No. 09 CIV. 10287 AJN, 2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012).................. 17, 19

*Friel v. Dapper Labs, Inc.*,
No. 21-cv-5837, 2023 WL 2162747  (S.D.N.Y. Feb. 22, 2023) ..................................... 5

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985)..................................................................................... 9, 12

*Glazer v. Abercrombie & Kent, Inc.*,
No. 07 C 2284, 2009 WL 3060269 (N.D. Ill. Sept. 22, 2009)........................................ 22

*Green v. New York City Dep't of Correction*,
No. 98 CIV 825 (JGK), 1999 WL 219911 (S.D.N.Y. Apr. 15, 1999).............................. 28

*Harman v. Harper*,
914 F.2d 262 (9th Cir. 1990) .................................................................................... 12

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) ................................................................................... 25

*In re Genesis Global Holdco, LLC, et al.*,
No. 23-10063 (SHL) (Bank. S.D.N.Y.) (Jan. 20, 2023) ................................................. 1

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011)............................................................................ 9

*Int'l Brotherhood of Teamsters v. Daniel*,
439 U.S. 551 (1979)................................................................................................. 22

*Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*,
    No. 17 CIV. 6334 (PGG), 2020 WL 2614765 (S.D.N.Y. May 22, 2020) ...................... 20

*LeBrun v. Kuswa*,
    24 F. Supp. 2d 641 (E.D. La. 1998). .............................................................. 20

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)........................................................................ 29

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)................................................................................... 22

*McNabb v. SEC*,
    298 F.3d 1126 (9th Cir. 2002) ....................................................13-14, 17-18, 21

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017)........................................................................ 30

*Piaubert v. Sefrioui*,
    No. 97-56131, 2000 WL 194149 (9th Cir. Feb. 17, 2000) ................................ 17

*Pollack v. Laidlaw Holdings, Inc.*,
    27 F.3d 808 (2d Cir. 1994).......................................................................14-16

*Premier Microwave Corp. v. Comtech Telecomms. Corp.*,
    88 Civ. 2570 (KMW), 1991 WL 12430 (S.D.N.Y. Jan. 28, 1991)....................... 18

*Priv. Corp. Advisors, Inc. v. Heard*,
    No. 92 Civ. 5952 (LAP), 1995 WL 66647 (S.D.N.Y. Feb. 17, 1995)............................ 14

*Radiation Dynamics, Inc. v. Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972)........................................................................ 27

*Resolution Tr. Corp. v. Stone*,
    998 F.2d 1534 (10th Cir. 1993) ................................................................... 12

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)..........................................................................5-10

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990).............................................................................. *passim*

*SEC v. Alexander*,
    115 F. Supp. 3d 1071 (N.D. Cal. 2015) ........................................................ 30

*SEC v. Blockvest*,
    No. 18-cv-2287, 2019 WL 625163 (S.D.Ca. Feb. 14, 2019).............................................. 27

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)....................................................................................... 23

*SEC v. Cavanagh*,
    1 F. Supp. 2d 337 (S.D.N.Y. 1998), ............................................................................ 23

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)....................................................................................... 28

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*,
    120 F.2d 738 (2d Cir. 1941)....................................................................................... 28

*SEC v. Cotton*,
    No. SACV 06-0905 AG(ANX), 2006 WL 6382128 (C.D. Cal. Dec. 21, 2006 ............... 29

*SEC v. Edwards*,
    540 U.S. 389 (2004)......................................................................................... 2, 8, 13

*SEC v. Fernandez*
    No. 6:19-CV-1843-RBD-LRH, 2021 WL 6125520 (M.D. Fla. Feb. 22, 2021).............. 29

*SEC v. Gabelli*,
    568 U.S. 442 (2013)................................................................................................. 28

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011)........................................................................................ 33

*SEC v. Glen-Arden Commodities*,
    493 F.2d 1027 (2d Cir. 1974)................................................................................. 7, 25

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)..................................................................6-7, 9

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975)....................................................................................... 29

*SEC v. Norton*,
    No. 95 CIV. 4451 (SHS), 1998 WL 691043 (S.D.N.Y. Sept. 30, 1998) ...................... 30

*SEC v. R.G. Reynolds Enterprises, Inc.*,
    952 F.2d 1125 (9th Cir. 1991) .................................................................................. 19

*SEC v. Ripple Labs, Inc.*,
   No. 20-cv-10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............................ 14

*SEC v. Telegram Grp., Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................................ 10-11

*SEC v. Thompson*,
   732 F.3d 1151 (10th Cir. 2013) ...................................................................................... 16-18

*SEC v. Universal Express, Inc.*,
   475 F. Supp. 2d 412 (S.D.N.Y. 2007) ............................................................................... 28

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ...................................................................................................... *passim*

*SEC v. Wallenbrock*,
   313 F.3d 532 (9th Cir. 2002) ............................................................................. 14-15, 17, 22

*SEC v. Wyly*,
   56 F. Supp. 3d 394 (S.D.N.Y. 2014) .................................................................................. 30

*SEC. v. Credit Bancorp, Ltd.*,
   738 F. Supp. 2d 376 (S.D.N.Y. 2010) ............................................................................... 29

*SEC v. Shavers*,
   4:13–CV–416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ............................................. 5

*Stoiber v. SEC*,
   161 F.3d 745 (D.C. Cir. 1998) .......................................................................... 14-15, 18, 22

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) .......................................................................................................... 20

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
   651 F.2d 1174 (6th Cir. 1981) .......................................................................................... 12

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ...................................................................................................... 5, 20

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ................................................................................................. 4

*United States v. Naftalis*,
   44 U.S. 768 (1979) ............................................................................................................ 26

*United States v. Pierre*,
    19-CR-783, 2021 WL 4150969 (S.D.N.Y. Sept. 13, 2021)...................................... 8

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008)........................................................................ 27

*Wildes v. BitConnect Int'l PLC*,
    25 F.4th 1341 (11th Cir. 2022) ................................................................... 27

*Yoder v. Orthomolecular Nutrition Inst.*,
    751 F.2d 555 (2d Cir. 1985)........................................................................ 27

## STATUTES

15 U.S.C. § 77b(a)(1)............................................................................................. 4

15 U.S.C. § 77b(a)(3).......................................................................................26-27

15 U.S.C. § 77e(a)............................................................................................... 23

15 U.S.C. § 77e(c)............................................................................................... 23

15 U.S.C. § 78c(a)(10).......................................................................................... 4

## RULES

Fed. R. Civ. P. 8(a) ............................................................................................... 7

Fed. R. Civ. P. 12(b)(6).......................................................................................... 7

Fed. R. Civ. P. 15(a) ........................................................................................... 30

## OTHER AUTHORITIES

Complaint, *Gemini Trust Company, LLC v. Digital Currency Group, Inc.*,
    No. 653260/2023 (N.Y. Sup Ct.) ............................................................... 1

## PRELIMINARY STATEMENT

Between February 2021 and November 2022, Defendants Genesis Global Capital LLC ("Genesis" or "GGC") and Gemini Trust Company LLC ("Gemini" or "GTC") (collectively "Defendants") raised billions of dollars by engaging in an unregistered offer and sale of securities through the Gemini Earn program ("Gemini Earn"). Targeting retail investors, Defendants characterized Gemini Earn as an "investment" program, touting eye-popping returns: "more than 100x the average national interest rate." To participate, retail investors entered into agreements with Defendants ("Gemini Earn Agreements") and tendered their crypto assets in exchange for the promise of profits. Defendants did not file a registration statement in connection with this offer and sale of securities, as required by the securities laws, instead making only selective and inadequate disclosures. As a result, retail investors lacked information about Gemini Earn and Defendants that would have been material to their investment decisions.

Retail investors poured billions of dollars into Gemini Earn. In November 2022, Genesis experienced a liquidity crisis amid volatility in the crypto asset market. The approximately 340,000 retail investors who had crypto assets invested with Genesis at that time were left holding the bag: Genesis unilaterally froze the withdrawal of approximately $900 million of those investors' assets. One week after the SEC filed this Complaint, Genesis filed for bankruptcy,[1] and Gemini later sued Genesis' parent company for fraud related to Gemini Earn.[2] Investors have not received a penny of their $900 million frozen by Genesis.

In their motions to dismiss, Defendants ignore the devastating harm their illegal conduct has caused investors, and instead attempt to transform Gemini Earn into something it was not – a

---

[1] *In re Genesis Global Holdco, LLC, et al.,* No. 23-10063 (SHL) (Bank. S.D.N.Y.) (Jan. 20, 2023).
[2] Complaint, *Gemini Trust Company, LLC v. Digital Currency Group, Inc.*, *et al.*, No. 653260/2023 (N.Y. Sup Ct.).

series of commercial loans. Gemini also argues that the SEC's claims should be dismissed because no "sale" occurred, even though Defendants raised billions of dollars through the program. In these and other arguments, Defendants improperly elevate form over substance instead of focusing on the "economic reality" of Gemini Earn. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 393 (2004) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

Defendants advance four arguments, all of which lack merit. *First*, the SEC sufficiently alleges that Gemini Earn constituted an investment contract under the test set forth in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946).

*Second*, the SEC sufficiently alleges that the Gemini Earn Agreements were notes and, as offered and sold as part of Gemini Earn, were securities under the test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

*Third*, the SEC has sufficiently made a *prima facie* claim under Section 5 of the Securities Act of 1933 ("Securities Act") and has more than adequately alleged that there have been offers and sales of securities by Defendants through Gemini Earn.

Finally, Defendants' request to dismiss two of the SEC's requests for relief are improper, and in any event, the SEC has more than adequately alleged a factual basis for each.

Accordingly, the motions should be denied.

## SUMMARY OF THE ALLEGATIONS

In February 2021, Defendants together began offering an investment opportunity they called "Gemini Earn" to retail investors in the United States and other countries. Compl. ¶ 25. Genesis offered to engage in specialized efforts to lend investors' crypto assets in separate counterparty transactions in exchange for interest payable to investors. *Id.* ¶¶ 28, 38, 40-41, 61-

67. Gemini aggressively marketed the program and provided retail investors with access to the investment opportunity, then deducted an "Agent Fee" from the returns generated by Genesis. *Id*. ¶¶ 28-29, 33-37, 49-50, 62.

To participate in Gemini Earn, investors entered into a tri-party Gemini Earn Agreement with Defendants. *Id*. ¶ 26. Investors either transferred their own crypto assets to Gemini, or acquired crypto assets via Gemini's trading platform, and then investors tendered those assets to Defendants in order to participate in the program. *Id*. Gemini then aggregated the crypto assets for Gemini Earn and placed them in a digital wallet, under Genesis' possession and control. *Id*. Genesis pooled investors' assets, and exercised discretion in how to lend or use those assets. *Id*. ¶ 38.

Defendants touted Gemini Earn – an investment product that bore the name of one Defendant – as a profitable investment broadly to the public through websites and social media. *Id*. ¶¶ 33-37, 49-50, 62. Defendants promoted the program as a "yield" bearing product with high returns for investors. *Id.* ¶¶ 33-37, 50, 62-67. Gemini explicitly referred to the program as an "investment" and Genesis marketed itself as the "premier institutional digital asset financial services firm," and the "world's largest digital asset lender," touting its managerial know-how. *Id*. ¶¶ 35, 63.

By November 2022, approximately 340,000 retail investors, mostly in the United States, had invested crypto assets with Genesis through Gemini Earn. *Id*. ¶ 25. That same month, Genesis unilaterally announced that it would not allow these investors to withdraw their crypto assets from the program because "withdrawal requests…exceeded our current liquidity." *Id*. ¶ 7. At the time, retail investors had approximately $900 million on deposit under Genesis' control, none of which has been returned. *Id*.

**LEGAL STANDARD**

A complaint may be dismissed only to the extent that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the pleading stage, courts must "accep[t] all factual allegations in the complaint as true, and dra[w] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Under Federal Rule of Civil Procedure 8(a), which applies here, a complaint is "not require[d] [to contain] detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint meets the 12(b)(6) standard if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

**ARGUMENT**

**I.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT GEMINI EARN CONSTITUTES AN INVESTMENT CONTRACT UNDER *HOWEY***

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act"), the definition of a security includes an "investment contract." *See* 15 U.S.C. §§ 77b(a)(1); 78c(a)(10). The Supreme Court defined the term "investment contract" to include any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298.[3] The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975). This test embodies a "flexible rather than

---

[3] Courts of Appeal, including the Second Circuit, have uniformly held that "solely" was not to be taken literally. *See United States v. Leonard*, 529 F.3d 83, 88 n.6 (2d Cir. 2008) (collecting cases).

a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

The SEC pleaded sufficient facts that, if true, demonstrate Gemini Earn constituted an investment contract that was offered and sold by Defendants. *See* Compl. ¶¶ 56-67. Gemini Earn involved: (i) an investment of money (*id*. ¶ 57), (ii) in a common enterprise (*id*. ¶¶ 58-60), and (iii) with a reasonable expectation of profits derived from Defendants' efforts (*id*. ¶¶ 61-67). These facts alone are sufficient to defeat Defendants' motion to dismiss. *See Friel v. Dapper Labs, Inc.*, No. 21-cv-5837, 2023 WL 2162747, at *8 (S.D.N.Y. Feb. 22, 2023).

### A.   The Complaint Alleges That Gemini Earn Investors Participated In A Common Enterprise Through Horizontal Commonality

Defendants first argue that the SEC has failed to plead that Gemini Earn investors funded a "common enterprise"[4] by failing to plead horizontal commonality – that "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole." GGC Br. 9 (quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)).

Defendants are wrong. As advertised, Gemini Earn investors transferred their crypto assets to Genesis through Gemini to be pooled and used by Genesis for the purpose of generating returns in the form of interest as high as 8.05% to all investors. *Id*. ¶¶ 25-30, 34. The Complaint alleges that Genesis did not manage separate accounts for investors, but instead pooled investors' crypto assets and used them to generate returns for those investors, thus creating horizontal commonality. *Id*. ¶¶ 38-42, 59; *see Revak*, 18 F.3d at 87 (horizontal commonality is established

---

[4] Defendants do not contest that Gemini Earn investors' tendering of crypto assets satisfies the investment-of-money prong of *Howey*. *See SEC v. Shavers*, 4:13–CV–416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that investment of Bitcoin was an investment of money under *Howey*).

by a pooling of assets and sharing profits and risks of the enterprise); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("This is not a scenario where the funds of each investor were segregated and separately managed"). Indeed, the pooling of investor assets was *necessary* for Genesis to successfully operate the program – it was from that pool that Genesis determined whether, which, how much, and for how long the crypto assets would be used in counterparty transactions for generating revenue. *Id.* ¶¶ 38, 40-42, 59. Thus, any factual argument to the contrary – for example, that the pooling was "mere asset aggregation," (GGC Br. 10) – ignores the allegations that the profits for Gemini Earn were dependent on Genesis pooling investors' crypto assets and its ability to successfully deploy them, establishing horizontal commonality. Compl. ¶¶ 4, 38-42; *see Kik*, 492 F. Supp. 3d at 178 (finding horizontal commonality where promoter pooled funds and used them for its operations).[5]

Equally flawed is Defendants' argument that there is no horizontal commonality because the investments were open term[6] or that "Gemini's customers lent [crypto assets] to [Genesis] in an amount and on a timetable of their choosing." GGC Br. 9. That individual investors may choose when and how much to invest has no bearing on whether commonality exists. Indeed, in many cases where courts concluded that a promoter had sold an investment contract, investors had the ability to sell out of an investment separately and at their own discretion. *See e.g.*, *SEC v. Glen-Arden Commodities*, 493 F.2d 1027 (2d Cir. 1974) (investment contracts existed despite

---

[5] Defendants argue that the SEC "faile[ed] to allege how [Genesis'] efforts increased the value or expected return of the investment, beyond the conclusory allegation that Genesis 'deployed the pooled assets'" (GCC Br. 10-11), but that non-existent requirement sounds in "broad vertical commonality," which is insufficient under *Revak* to establish a common enterprise. 18 F.3d at 88. In any event, their argument also ignores the detailed allegations describing Genesis' efforts to create successful returns for Gemini Earn investors. *See e.g.*, Compl. ¶¶ 38-42, 63-66.

[6] As defined by the Gemini Earn Agreement, "open term" means that the investments had no maturity date and Genesis had a prepayment option and Gemini Earn investors had a call option. Exhibit 1 to GGC Brief.

purchasers being able to individually sell out of investments); *Kik*, 492 F. Supp. 3d at 179 (rejecting argument that there could be no commonality because investors could sell at different times).

Defendants also seek to add non-existent requirements to horizontal commonality by arguing that investors did not earn profit in an amount based on the returns that Genesis generated in its lending business and that investors did not share in the profits or losses with Genesis or other investors on a *pro rata* basis. GGC Br. 10.[7] But courts do not require an agreement to distribute profits *pro rata* to establish horizontal commonality. *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("formalized profit-sharing mechanism" such as rights to *pro rata* distributions "is not required for a finding of horizontal commonality"); *Kik*, 492 F. Supp. 3d at 178 ("pro-rata distribution of profits . . . is not required."). There is similarly no requirement that profits paid to investors be proportional to the profits a promotor generates for itself. Rather, horizontal commonality is established when, as here, "investors' assets are pooled and the fortune of each investor is tied to the fortunes of other

---

[7] Defendants' reliance on *Deckeback v. LaVida Charters, Inc. of Fla.*, 867 F.2d 278 (6th Cir. 1989) is misplaced. GGC Br. 10. *Deckeback* involved a one-on-one arrangement between the purchaser of a yacht and a manager, whereas here, Defendants offered indistinguishable, pooled investments into Gemini Earn generally to the investing public. 867 F.2d at 284; Compl. ¶¶ 25, 59. In *Deckeback*, there was no pooling of individual assets and the court specifically noted that "the failure of the La Vida business operation would not have caused the yacht owners necessarily to fail and to lose use of their vessels." *Id.* at 283. Here, Gemini Earn investors were restricted from withdrawing their crypto assets when Genesis experienced liquidity issues. Compl. ¶ 60. Similarly, Defendants' attempts (GGC Br. 11) to analogize their investment product to the one held by the Second Circuit not to be an investment contract in *Revak* fail because, as explained above, Defendants pooled the crypto assets of Gemini Earn investors and managed those funds indistinguishably, on behalf of investors. *Revak*, by contrast, involved separate condominium sales with no commonality between the various purchasers. 18 F.3d at 88.

investors as well as to the success of the overall enterprise." *SEC v. Telegram Grp., Inc.*, 448 F.

Supp. 3d 352, 369 (S.D.N.Y. 2020) (citing *Revak*, 18 F.3d at 87).[8]

      Attempting to deny the economic reality of Gemini Earn, Defendants also recast the

Complaint by arguing that the program – a highly specialized investment opportunity involving

the lending and investing of pooled crypto assets and marketed to retail investors with no ability

to negotiate the terms – was simply a series of individually negotiated commercial loans. *See,*

*e.g.*, GGC Br. 2-4. Defendants assert that the Gemini Earn Agreements referred to the subject

transactions as "loans" and therefore should be treated as such. GGC Br. 2. But Defendants'

labeling of their scheme as "loans" is not dispositive; the focus is not on the labels assigned but

on the economic realities of the transactions. *See Edwards*, 540 U.S. at 393 ("Congress' purpose

in enacting the securities laws was to regulate investments, in whatever form they are made and

by whatever name they are called.") (cleaned up); *see, e.g.*, *United States v. Pierre*, 19-CR-783,

2021 WL 4150969, *4 (S.D.N.Y. Sept. 13, 2021) ("Calling something a loan does not make it a

loan.").

      Defendants further contend that "each loan here stands on its own, with each loan having

its own separate terms" (GGC Br. 11), and that the Gemini Earn Agreements treated "every loan

from an Earn customer as an obligation of [Genesis], independent of any potential losses that

[Genesis] may suffer with respect to loans that it made to its borrowers," (GGC Br. 10), such that

there can be no commonality. But the Complaint pleads the opposite, alleging that Gemini Earn

was "***not*** a scenario where the funds of each investor were segregated and separately managed."

---

[8] Similarly, Defendants' reliance on *Cooper v. King*, 114 F.3d 1186 (6ᵗʰ Cir. 1997) is inapposite. *Cooper* is plainly distinguishable – the plaintiffs in that case were not entitled to profits, but instead had entered into a leaseback of a payphone purchase that entitled them to a $75 per month payment, with no additional exposure to the underlying financial investment. That is nothing like the investment scheme described in the Complaint.

Compl. ¶ 59; *Kik*, 492 F. Supp. 3d at 179 (emphasis added). Rather, Gemini Earn provided set terms that were widely offered to investors. *See, e.g.*, Compl. ¶¶ 25-26, 33-37, 49-50, 59; *see Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240–41 (2d Cir. 1985) (distinguishing a "one-of-a-kind arrangement" with a promoter from a program "offered to the public at large" and holding that investment contract existed where customers were "buying an opportunity to participate" in program offering certificates of deposits for which promoter enlisted third party banks to pay fixed rates of interest).

### B. The Complaint Alleges That Gemini Earn Investors Participated In A Common Enterprise Through Strict Vertical Commonality

Defendants also ignore that the Complaint pleads a common enterprise through strict vertical commonality, as the fortunes of Genesis are tied to the fortunes of the investors.[9] *See Telegram* 448 F. Supp. 3d at 369–71 (vertical commonality existed where "Telegram's fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the [blockchain]"). The Complaint pleads strict vertical commonality because Defendants and Gemini Earn investors earned profits when Genesis used the crypto assets for the purpose of generating revenue. Compl. ¶¶ 3-4, 23, 59-60. Specifically, the investors' crypto assets that were obtained by Genesis through Gemini Earn were used for the core of Genesis' business – to earn interest from lending crypto assets to institutional counterparties. *Id.* ¶¶ 23-25, 38, 59. That is how Genesis made money for itself, for Gemini's agent fee, and to pay the

---

[9] Defendants wrongly state that the standard for establishing a "common enterprise" in the Second Circuit is limited to a showing of horizontal commonality. GGC Br. 9. No court in the Second Circuit has rejected "strict vertical" commonality as a viable theory to establish the commonality prong of *Howey*. *Revak* set forth the standard for horizontal commonality, but said nothing regarding strict vertical commonality other than, based on the record, it "need not address the question." 18 F.3d at 88. Following *Revak*, courts in this district have consistently held that strict vertical commonality is sufficient to establish a common enterprise. *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (same) (collecting cases).

interest Defendants had promised to Gemini Earn investors, aligning their interests and creating strict vertical commonality. *Id.*; *see Telegram* 448 F. Supp. 3d at 369–71.

Defendants' attempt to argue that Genesis' liquidity crisis (or subsequent insolvency) is not a factor in demonstrating commonality is similarly unavailing. That Gemini Earn investors lost access to their crypto assets as a result of Genesis' liquidity crisis demonstrates that the fortunes of the investors were tied to the fortunes of the promoter. Genesis utilized pooled crypto assets to generate returns for itself and for Gemini Earn investors; when these returns were no longer sufficient to cover withdrawal requests, the enterprise could not continue. In an effort to rebut this stark economic reality, it is the Defendants, not the SEC, who are attempting to conflate commonality with the expectation of profits prong by relying on cases that do not involve an expectation of profit based on marketing of the type of systematic and programmatic efforts by Genesis that are present here.[10]

### C. The Complaint Alleges That Reasonable Investors Expected Profits in Gemini Earn to Come from Defendants' Managerial Efforts

The Complaint also contains allegations that reasonable Gemini Earn investors expected profits to come from Defendants' managerial efforts.[11] Compl. ¶¶ 61-67. Defendants publicly

---

[10] *Elson v. Geiger*, 506 F. Supp. 238, 241–42 (E.D. Mich. 1980) (commercial arrangements at issue had none of the *Howey* factors *other* than profits in the form of fixed interest, including no entrepreneurial or managerial efforts of others). Defendants' claim that the SEC's *Howey* analysis would turn any supplier agreement or sales arrangement with payment after delivery into an investment contract (GGC Brief at 14) is absurd. Without more, these arrangements would not involve an expectation of profit from the efforts of others. But they're entirely different from an investment program, such as Gemini Earn, which Defendants specifically marketed as a profit-making opportunity based upon Defendants' efforts, and wherein investors indefinitely invested their crypto assets with Genesis in exchange for interest with the expectation, based upon Defendants' own marketing, that Genesis' efforts would continue to translate to high rates of return.

[11] In arguing that the SEC has not adequately alleged the offer and sale of an investment contract under *Howey*, Defendants may attempt to rely on the recent summary judgment ruling in *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023). In the case, the court concluded that Ripple's sales of XRP in so-called "Institutional Sales," *i.e.*, those made "directly to

promoted Gemini Earn as an "investment" and way for investors to "earn yield," touting that

Defendants had "designed a program that allows our customers the ability to generate a real

return on their crypto holdings." *Id*. ¶¶ 33-34, 36. Genesis further promoted itself as the "premier

institutional digital asset financial services firm" and "the world's largest digital asset lender,"

advertising that "[h]olders of digital currencies can earn yield on their assets by lending directly

to Genesis, a regulated and trusted counterparty." *Id*. ¶¶ 63, 65. In fact, Genesis controlled the

pooled crypto assets that it received from investors and determined how much and what type of

crypto asset to hold, lend out to others, or otherwise use. *Id*. ¶¶ 38, 40. Genesis determined the

interest rates that it promised to pay to Gemini Earn investors and pooled crypto assets, identified

counterparties, conducted due diligence, negotiated agreements, evaluated market conditions,

managed risk, and set collateral levels for returns. *Id*. ¶¶ 38, 40-41, 64-66. Based on these efforts,

Gemini advertised that Gemini Earn investors could "receive more than 100x the average

national interest rate, among the highest rates on the market," inviting investors to deposit their

crypto assets to be used by Genesis to generate rates much higher than what they could otherwise

receive on their own. *Id*. ¶ 36. The pleading of these facts is more than sufficient to defeat

Defendants' motions to dismiss on this point. *See Friel*, 2023 WL 2162747, at *8 (recognizing in

a crypto asset case that "at the motion to dismiss stage, Plaintiffs must plead facts adequate to

establish the three prongs of the *Howey* test.").

---

certain counterparties … pursuant to written contracts" were offers and sales of investment contracts, *id.*
at *2, *8–11, but that its "Programmatic Sales" sales "on digital asset exchanges … [in] blind bid/ask
transactions" were not.  Id. at *2, *11–13. The SEC respectfully avers, however, with respect to the
Programmatic and other sales, *Ripple* conflicts with and adds unsupported requirements to *Howey* and its
progeny. Those portions of *Ripple* were wrongly decided and this Court should not follow them. SEC
staff is considering the various available avenues for further review and intends to recommend that the
SEC seek such review. In any event, *Ripple* is entirely inapposite here: Defendants offered and sold
Gemini Earn *directly* to investors, marketed the program *directly* to investors, and investors understood
their crypto assets were going to be used by Genesis and Gemini in the specialized crypto asset lending
program that bore Gemini's name. Compl. ¶¶ 25-26, 33-37, 62-67.

Equally unavailing are Defendants' arguments that the Gemini Earn program was not an investment contract because investors had no "entitlement to capital appreciation resulting from their initial loan or that they shared in the earnings that flowed from [Genesis'] deployment of their assets." GGC Br. 12.[12] The Complaint adequately alleges that Gemini Earn investors' returns were reliant on Genesis' efforts to generate revenue by loaning out the investors' crypto assets. Compl. ¶¶ 40-41, 63-66 (describing efforts by Genesis pooling crypto assets, identifying counterparties for transactions, negotiating agreements, managing risk, evaluating market conditions, negotiating and revising interest rates, and setting collateral levels for returns).

Defendants' argument that Genesis' efforts "made no difference" to investors' profits (GGC Br. at 12), is contracted by the allegations and is illogical: if Genesis was not successful in generating returns based on the pooled crypto assets, Defendants could not continue offering the "highest rates" in the market to investors on a monthly basis. Compl. ¶ 66. Indeed, the monthly interest rates were revised based on Genesis' ongoing managerial efforts. *Id*.; *see Gary Plastic*, 756 F.2d at 240–41 (investment contract exists where investors were "motivated by the expectation of a return of cash investment, the potential for price appreciation due to interest rate fluctuations and liquidity" and where customers relied on the issuer's "skill and financial stability" and "ongoing monitoring" of market).[13] As to the type of profits, "profits in the sense

---

[12] Defendants cite to a number of cases where instruments with fixed rates of return were deemed not to be investment contracts (GGC Br. 12-13), but their facts are inapposite to the instant case. *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1182 (6th Cir. 1981) (short-term loans, that neither party referred to as investments, with collateral, which was "strongly suggestive of a commercial loan"); *Union Nat'l Bank of Little Rock v. Farmers Bank, Hamburg, Ark.*, 786 F.2d 881, 884–85 (8th Cir. 1986) (ordinary short-term commercial loan with profits not based on the effort of others). Defendants also cite to *Resolution Tr. Corp. v. Stone*, which involved fixed-rate car loans, whereas the rates of interest offered by Gemini Earn varied month-to-month based on Genesis' efforts. 998 F.2d 1534, 1536, 1540 (10th Cir. 1993).

[13] Defendants rely on *Harman v. Harper*, 914 F.2d 262 (9th Cir. 1990) and *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A.*, 919 F.2d 510 (9th Cir. 1990) that are inapposite. GGC Br.

of income or return" includes "for example, dividends, *other periodic payments*, or the increased

value of the investment." *Edwards*, 540 U.S. at 394 (emphasis added).

## II.    THE COMPLAINT SUFFICIENTLY ALLEGES AN OFFER AND SALE OF SECURITIES UNDER *REVES*

The Complaint adequately alleges that the Gemini Earn Agreements were notes and that

Gemini Earn constituted an offer and sale of securities under *Reves*. Compl. ¶¶ 44-55. A note is

presumed to be a security unless it bears a strong resemblance to instruments that are not

securities, which courts determine by examining four factors: (1) the motivation of the parties;

(2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of

an alternative regulatory regime that "significantly reduces the risk of the instrument" for

investors other than the securities laws, "thereby rendering application of the Securities Acts

unnecessary." *Reves*, 494 U.S. at 64–69.

### A.    The Complaint Sufficiently Alleges that the Motivations of Defendants and the Gemini Earn Investors Demonstrate that the Gemini Earn Agreements were Securities Notes

Under the first *Reves* factor, a note is likely to be a security "[i]f the seller's purpose is to

raise money for the general use of a business enterprise or to finance substantial investments and

the buyer is interested primarily in the profit the note is expected to generate." *McNabb v. SEC*,

298 F.3d 1126, 1131 (9th Cir. 2002) (quoting *Reves*, 494 U.S. at 66).

Defendants argue that the motivation of Defendants and the Gemini Earn investors was

simply to make and accept loans. GGC Br. 15. But the Complaint specifically alleges that

Genesis offered Gemini Earn to obtain crypto assets for the use of its business – namely, to run

---

12-13. Gemini Earn bears no resemblance to the arrangements described in *Harman*, which involved a series of separate note transactions. 914 F.2d at *4-6. Rather, the economic reality is that reasonable investors would have expected that Genesis was undertaking significant efforts on their behalf to generate returns on their crypto assets. The same is true for *First Citizens*, 919 F.2d at 515–16.

its institutional lending activities, generate profits for itself, and to pay the interest promised to Gemini Earn investors and others. Compl. ¶¶ 23, 42, 45. In addition, Genesis used the crypto assets as collateral for its own borrowing and would hold assets on its balance sheet to meet liquidity demands. *Id.* ¶ 46. Genesis' motivation thus is a far cry from those situations evidencing a commercial purpose, such as "remedying a cash flow deficit or purchasing a specific asset." *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998). Rather, the funds were necessary for its "general business activities*.*" *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812–13 (2d Cir. 1994); *McNabb*, 298 F.3d at 1131 (interest-bearing notes satisfied the first *Reves* factor where the money raised was used for the business, not for cash-flow purposes); *SEC v. Wallenbrock*, 313 F.3d 532, 538 (9th Cir. 2002) (automatic rollover of notes from month to month suggestive of intent to use investors' money for long-term financing and thus a security); *Priv. Corp. Advisors, Inc. v. Heard*, No. 92 Civ. 5952 (LAP), 1995 WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995) (notes "were part of a larger financing operation" in which "the proceeds from the loan[s] were the equivalent of equity capital"). Further, the investors were only provided general information regarding how Genesis would deploy the assets. *See* Compl. ¶ 38; Exhibit 1 to GGC Brief; *see, e.g.*, *Wallenbrock*, 313 F.3d at 538 (lack of information regarding assets backing loan indicated investment for general business purposes).

In turn, investors participated in Gemini Earn to receive interest on their crypto assets. Compl. ¶ 45*.* Gemini Earn investors were not simply motivated by short-term interest at market rates, but sought the "highest rates on the market," which were adjusted on a monthly basis, and they were motivated by how much they could earn by participating in the program for one or more years based on the promises of returns through the efforts of Genesis. *Id*. ¶¶ 47, 50, 66; s*ee Reves*, 494 U.S. at 58–59 (variable rate designed to stay above rate offered by local financial

institutions); *Wallenbrock*, 313 F.3d at 538 (automatic rollover of the notes with an interest rate above market rates suggestive of a security); *Stoiber*, 161 F.3d at 749–50 (first *Reves* factor was satisfied where "profit in the form of interest" was customers' primary goal).

Defendants argue that the open term nature of the notes signals lack of investment intent (GGC Br. 15), but "[c]ommon stock traded on a national exchange is the paradigm of a security, and it is as readily convertible into cash as is a demand note." *Reves*, 494 U.S. at 69. And the fact that Genesis promised investors the pre-determined rate of interest regardless of its profit or loss does not make the note any less a security.[14] *See Pollack*, 27 F.3d at 813–14 (finding that that a fixed rate of interest did not justify "characterizing appellants' motivations as anything but investment" and noting that fixed rate bonds are securities).[15]

Unless Gemini Earn investors affirmatively demanded repayment on these open term notes, their assets would stay in the program indefinitely, accruing variable interest based on Genesis' continued effort. Compl. ¶¶ 31, 66. Investors understood that, for them to continue to receive, on a monthly basis, such high interest rates, Genesis must continue to successfully use their crypto assets in its specialized investment program. *Id.* ¶¶ 65-66. This is nearly identical to notes in *Reves*, where the interest rate was revised to stay above the rate offered by local financial institutions. *See Reves*, 494 U.S. at 67–68.

---

[14] Defendants argue that investors supposedly received interest independent of any gains or losses that Genesis may have enjoyed or suffered (GGC Br. 15), but, as alleged, investors' ability to receive interest was *not* independent from Genesis' gains or losses as Genesis' liquidity crisis resulted in investors' inability to receive accrued interest or even their principal investments – without any insurance or collateral to draw upon. Compl. ¶¶ 7, 52, 54.

[15] Defendants cite to *Asset Prot. Plans, Inc. v. Oppenheimer & Co., Inc.* (GGC Br. 17), but that case is factually inapposite as each note was guaranteed and collateralized and subject to extensive negotiations following private solicitation. No. 8:11-CV-440-T-23MAP, 2011 WL 2533839, at *4 (M.D. Fla. Jun. 27, 2011). Similarly, Defendants cite to *Intelligent Digital Systems, LLC v. Vis Management Systems, Inc.* (GGC Br. 17), wherein the court stated, "[t]he transaction here is best described as the sale of technology from one business to another for a lump sum." 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010).

Defendants cite to *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51 (2d Cir. 1992) (GGC Br. 16), in support of their argument that the notes at issue were merely commercial loans. GGC Br. 16. But there, "(1) all parties were sophisticated commercial or financial institutions that received 'detailed individualized presentations' about the product; (2) the instruments were not offered to the general public; and therefore (3) eligible buyers were limited to sophisticated entities 'with the capacity to acquire information about the debtor.'" *SEC v. Thompson*, 732 F.3d 1151, 1166 (10th Cir. 2013) (discussing and quoting *Banco Espanol*, 973 F.2d at 55); *Pollack*, 27 F.3d at 813–14 ("*Banco Espanol* was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements."). Unlike the sophisticated note purchasers in *Banco Espanol*, the retail investors of Gemini Earn were not interested in a short-term return on excess cash, but rather sought an investment opportunity with the highest rates on the market. Compl. ¶¶ 47, 50.[16]

Defendants argue that the Gemini Earn Agreements were not transferable, assignable, or tradable on the secondary market (GGC Br. 17), but, just as with the notes in *Reves*, these characteristics are not necessary to a finding that the Gemini Earn investors were motivated by profit. *See Reves*, 494 U.S. at 68. Gemini Earn was structured and advertised in such a way that assignability or a secondary market was unnecessary for profit. Defendants also claim that the rates of interest were not so high as to suggest an investment purpose (GGC Br. 18), but it was

---

[16] Furthermore, the lenders' motivation in *Banco Espanol* was to increase lines of credit available to a banking customer as part of a continuing credit relationship, *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 42 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992), a far cry from Genesis' desire and need for crypto assets to fund its entire business enterprise.

Defendants who explicitly described Gemini Earn as an "investment" offering the "highest" interest rates on the market.[17] Compl. ¶¶ 35-36.

**B.  The Complaint Adequately Alleges a Plan of Distribution Sufficient to Establish a Securities Offering**

The Complaint alleges that Defendants publicly advertised Gemini Earn on websites and social media, and at least 340,000 investors participated in the program. Compl. ¶¶ 33-37, 49. In the US and elsewhere, Gemini Earn was offered to the general public and there were effectively no limits, including no minimum investment, on who could participate. *Id.* ¶¶ 25, 33-34. Defendants' broad and ongoing advertising campaign evidenced their intent to expand Gemini Earn, including the number of investors – highly suggestive of a security. *Thompson*, 732 F.3d at 1164 ("Ultimately, the Supreme Court has instructed that the offer and sale of instruments to a 'broad segment of the public' is all that is necessary to establish this element.") (quoting *Reves*, 494 U.S. at 68)); *Wallenbrock*, 313 F.3d at 539 ("the broad availability of the notes, plus [the issuer's] evident interest in widening the scope of distribution, tips this factor strongly in favor of classifying the note as a security."). Distributions of notes to far fewer than 340,000 investors have been found to be securities.[18]

---

[17] Defendants cite to *Piaubert v. Sefrioui* (GGC Br. 18), but in that case, the court found that the 6 percent rate of interest was not suggestive of investment intent because the prime lending rate, at that time, was 7.25%. No. 97-56131, 2000 WL 194149, at *2 (9th Cir. Feb. 17, 2000). Here, Defendants have advertised Gemini Earn has offering the highest rates on the market, supporting the inference that the investors possessed investment intent. Compl. ¶¶ 47, 50.

[18] *See, e.g.*, *Reves*, 494 U.S. at 68 (notes offered to over 23,000 individuals); *McNabb*, 298 F.3d at 1132 (ten notes issued to six individuals); *Wallenbrock*, 313 F.3d at 539 (notes held by over 1,000 investors); *Thompson*, 732 F.3d at 1164–65 (finding that even though the first note holders were "family and friends," defendant "sought to expand its distribution to anyone interested who had $100,000 to invest— even if that meant unsophisticated investors obtaining the money by liquidating home equity."); *Stoiber*, 161 F.3d at 750–51 (notes offered to thirteen individuals); *Fragin v. Mezei*, No. 09 CIV. 10287 AJN, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012) (notes offered to over eleven individuals and institutions).

Defendants argue that their plan of distribution was limited because it was only offered to Gemini customers and there was no secondary market. GGC Br. 18. But the program was broadly advertised over the internet, including social media, and any member of the general public could seek to create a Gemini account and directly participate in Gemini Earn with no minimum investment. Compl. ¶¶ 25, 33-37, 49. Accordingly, no secondary market was even necessary. "Though it can be a strong indicator that a note is a security, the sale of the notes on an exchange is not necessary to establish the requisite common trading." *Thompson*, 732 F.3d at 1164 (citing *Reves*, 494. U.S. at 68).[19]

### C.  The Complaint Adequately Alleges that the Expectations of the Investing Public were that the Gemini Earn Notes were Investments

Under *Reves*, a court must consider "whether a reasonable member of the investing public would consider these notes as investments, 'even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction.'" *McNabb*, 298 F.3d at 1132 (quoting *Reves*, 494 U.S. at 66). The Supreme Court has described this factor as a "one-way ratchet" that allows "notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are," but does not "allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." *Stoiber*,

---

[19] Defendants cite three cases for the proposition that "non-transferable notes of this kind are routinely held to be non-securities," (GGC Br. 19), but each is inapposite. As described above, *Banco Espanol* involved short-term commercial arrangements among sophisticated commercial or financial institutions with the capacity to negotiate and acquire information about the debtor. 973 F.2d at 55. *Benedict v. Amaducci* involved "bailout" loans, not investments; the note purchasers were not primarily interested in the profit that the notes would generate; and the sellers' purpose was not to raise money for the general use of a business but rather to meet immediate cash obligations. No. 92 Civ. 5239 (KMW), 1995 WL 413206, at *9 (S.D.N.Y. July 12, 1995). *Premier Microwave Corp. v. Comtech Telecomms. Corp.* involved one note offered to one entity, far from the broad distribution of notes at issue here. 88 Civ. 2570 (KMW), 1991 WL 12430, at *4 (S.D.N.Y. Jan. 28, 1991).

161 F.3d at 751. "[T]his factor is an objective test that turns on whether a reasonable purchaser would have perceived the [n]otes to be an investment." *Fragin v. Mezei*, No. 09 CIV. 10287 AJN, 2012 WL 3613813, at *10 (S.D.N.Y. Aug. 22, 2012).

Defendants argue that the SEC "alleges no facts that suggest that the investing public would have expected that their loans were securities" and emphasizes the lack of secondary market and transferability of rights within Gemini Earn. GGC Br. 19. Defendants also argue that the interest rates are not so high as to suggest an investment. *Id.* But the Complaint more than adequately alleges that the economic realities – and Defendants own words – created the expectation by the investing public that Gemini Earn constituted the offer and sale of securities.

Defendants, through websites and social media, promoted Gemini Earn as an investment, specifically as a way to earn high "returns" or "yield" on investors' crypto assets. Compl. ¶ 33-34, 46. Gemini repeatedly described Gemini Earn as an "investment" and touted that the interest rates offered were "among the highest rates on the market" and also described the potential profits to be earned by investing for a period of multiple years. *Id.* ¶ 35-37. "Because the loans were pitched as investments, 'it would be reasonable for a prospective purchaser to take the [seller] at its word.'" *Bongiorno v. Baquet*, No. 20-CV-7288 (LJL), 2021 WL 4311169, at *17 (S.D.N.Y. Sept. 20, 2021) (quoting *Reves*, 494 U.S. at 69); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (characterizing a program issuing notes as an "investment program" would lead an investor reasonably to think of the financial interest as an investment.).

Defendants further argue that the boilerplate language of the Gemini Earn Agreement indicates that the parties intended only to enter into commercial loans (GGC Br. 20), but in construing the term "securities," courts are "not bound by legal formalisms, but instead take

account of the economics of the transaction under investigation." *Reves*, 494 U.S at 61; *see also Forman*, 421 U.S. at 849 (stating that "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto"); *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (in interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"); *Telegram*, 448 F. Supp. at 365 ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive.") (citing *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001))).

The economic realities of Gemini Earn, in which retail investors were invited to participate in a program repeatedly described as an "investment" offering rates of interest "among the highest rates on the market" for an indefinite period, would reasonably be perceived by the investing public as an offering of securities. Compl. ¶ 50. Defendants again cite to factually inapposite cases in which courts have found that the investing public would not expect the notes in question to be securities. GGC Br. 20-21.[20] Here, mere formalisms in the Gemini Earn Agreement, the terms of which investors could not negotiate, fail to negate the substantial allegations evidencing the economic realities of Gemini Earn and investors' expectations – supported by Defendants' own words – that Gemini Earn constituted an offering of securities. *See Telegram*, 448 F. Supp. 3d at 365 (disclaimers and public statements emphasizing consumptive use of Grams and rejecting any expectation of profit were insufficient to negate the substantial evidence that a reasonable purchaser expected to profit).

---

[20] The Court in *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, found persuasive that restrictions on the notes in question worked to prevent the notes from being sold to the general public and that the notes were only sold to institutional and corporate entities. No. 17 CIV. 6334 (PGG), 2020 WL 2614765, *8 (S.D.N.Y. May 22, 2020). In *LeBrun v. Kuswa*, the plaintiffs *stipulated* that they originally believed the loans were merely promissory notes. 24 F. Supp. 2d 641, 648 (E.D. La. 1998).

**D.  The Complaint Adequately Alleges that No Alternative Regulatory Regime or Risk-Reducing Factors Exist to Protect Gemini Earn Investors**

The fourth prong of the *Reves* test assesses whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would "significantly reduce[ ] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67. As alleged in the Complaint, there is no alternative regulatory regime or risk reducing factors to protect Gemini Earn investors. Compl. ¶ 51-55. The notes were unsecured and uncollateralized. *Id.* ¶ 54-55. The investments are not protected or insured by FDIC, SIPC, any other governmental program, or Defendants. Compl. ¶¶ 51-52. Nor did Defendants provide investors with the full panoply of information required by the federal securities laws. *Id.* ¶ 6. Although Gemini is registered as a New York trust company regulated by the New York State Department of Financial Services ("NYDFS"), NYDFS did not have oversight over Genesis or Gemini Earn. *Id.* ¶ 52; *see Reves*, 494 U.S. at 69 (finding no risk-reducing factor that would make the application of the federal securities laws unnecessary where the notes were uncollateralized and uninsured and would escape federal regulation entirely if the securities laws were held not to apply).

To support allegations as to the lack of risk reducing factors present, the Complaint also described the state of Gemini Earn, wherein over 340,000 investors have been unable to access approximately $900 million worth of crypto assets since November 2022. *Id.* ¶ 55. Any ruling that the notes issued through Gemini Earn are not securities would leave these investors totally unprotected. *See McNabb*, 298 F.3d at 1132–33 (finding that the promissory notes at issue were securities because "without such a classification there is the potential that the lender may be left open to significant risk.").

Defendants argue that contract law and New Jersey state consumer protections and common law provide additional avenues of protection (GGC Br. 21), but they do not cite a particular law or articulate how any state law can be the source of such alternative protection, nor explain how such laws would protect the hundreds of thousands of investors residing outside of New Jersey.[21] If Defendants' argument were to be accepted here, it would apply to effectively *every* note. Further, the cases on which *Reves* relied in discussing this factor, 494 U.S. at 69, involved alternative schemes of federal regulation. *See Marine Bank v. Weaver*, 455 U.S. 551, 557–58 (1982) (federal regulation of banks and FDIC insurance); *Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 569–70 (1979) (ERISA). "The existence of limited alternative regulatory enforcement mechanisms does not obviate the need for the protection of the Securities Acts" and therefore "the fact that a company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws." *Wallenbrock*, 313 F.3d at 540; *Stoiber*, 161 F.3d at 752 ("reliance on [Illinois state law] would expand the types of alternative protection cognizable beyond those contemplated in *Reves*.").[22]

Defendants also argue that the demand nature of the notes lessened the need for a regulatory scheme. GGC Br. 21. However, the Supreme Court rejected this very argument in *Reves*. There, the lower court found that the demand nature of the note was "uncharacteristic of a security." *Arthur Young & Co. v. Reves*, 856 F.2d 52, 54 (8th Cir. 1988), *rev'd sub nom. Reves v. Ernst & Young*, 494 U.S. 56 (1990). But Supreme Court disagreed, explaining that "[t]he

---

[21] Defendants also cite to *Glazer v. Abercrombie & Kent, Inc*. (GGC Br. 21), but that case addressed the fourth *Reves* prong at summary judgment, not the motion to dismiss stage, and merely found that, under the circumstances, the prong weighed "slightly" in favor of the defendants. No. 07 C 2284, 2009 WL 3060269, at *9 (N.D. Ill. Sept. 22, 2009).

[22] Defendants claim that "GGC backed all loans as principal." GGC Br. 21. While it is unclear what Defendants mean, what is clear is that it offered no practical protection to the Gemini Earn investors who have been unable to access their crypto assets since November 2022.

demand feature of a note does permit a holder to eliminate risk quickly by making a demand, but just as with publicly traded stock, the liquidity of the instrument does not eliminate risk altogether." *Reves*, 494 U.S. at 69.

**III.    THE COMPLAINT ALLEGES A *PRIMA FACIE* CLAIM UNDER SECTION 5, INCLUDING OFFERS AND SALES OF SECURITIES**

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. 15 U.S.C. § 77e(a). And Section 5(c) prohibits the offer or sale of securities through the mail or interstate commerce unless a registration statement has been filed. 15 U.S.C. § 77e(c). To establish a *prima facie* case under Section 5(a) and (c), the Commission need only allege: (1) that no registration statement was filed or was in effect as to the securities in question; (2) that the defendant, directly or indirectly, sold or offered to sell these securities; and (3) that in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). No scienter is required to establish a Section 5 violation. *Id*. There is no dispute that Defendants filed no registration statement and that Gemini Earn involved interstate commerce. *See e.g.*, Compl. ¶¶ 1-2, 6, 14, 29, 33-37, 49-50, 62-63, 68-71.

**A.    The Complaint Properly Alleges Offers and Sales of Securities Through Gemini Earn**

The Complaint alleges that Defendants engaged in the offer and sale of an investment opportunity – *i.e.*, Gemini Earn. *See, e.g.*, Compl. ¶¶ 1, 25. Defendants contend that the SEC has failed to allege any "sale" or "offer to sell" by asking the court to myopically focus only on the Gemini Earn Agreements, rather than the entire investment program of which they were a part. GTC Br. 2, 5-10. Defendants' entire argument is premised on the erroneous statement that "[t]he

only 'instrument' alleged here is the [Gemini Earn Agreement], but it was never sold." GTC Br.
6. Defendants thus argue that the Complaint should be dismissed because the Gemini Earn
Agreements themselves were not offered or sold.

As an initial matter, arguing that the inquiry is limited to the actual Gemini Earn
Agreements themselves – separate and apart from the Gemini Earn program of which they were
a part – ignores the numerous well-pled allegations in the Complaint regarding Defendants'
creation, marketing, promotion, operation, and distribution of Gemini Earn. *See, e.g*, Compl. pg.
13 ("***The Gemini Earn Program*** Constituted an Offer and Sale of Securities") (emphasis added).
Thus, Defendants' impermissibly narrow argument is inconsistent with the standards applicable
to a Rule 12(b)(6) motion, which require that a court accept facts as true and draw all reasonable
inferences in favor of the plaintiff. *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP
Morgan Chase Co.*, 553 F.3d 187, 196 (2d. Cir. 2009). Indeed, Defendants acknowledge that the
premise of their argument is the improper scrutiny of a single allegation to the exclusion of all
others. *See* GTC Br. 4 (noting "specific allegations at issue in this motion" and "the key
allegation is in paragraph 5"). Defendants makes no attempt to explain how focusing on a single
allegation can be reconciled with the standards applicable to a Rule 12(b)(6) motion.

As alleged, the Gemini Earn Agreements were a component of a larger investment
opportunity that constitutes the investment contract. The SEC alleges in detail how Defendants
***offered and sold*** securities through their creation, promotion, facilitation, and distribution of
Gemini Earn. *See e.g.*, Compl. ¶ 1 ("Through an investment opportunity that Defendants called
the "Gemini Earn" program, investors tendered crypto assets to Genesis and, in exchange,
Genesis promised to pay interest on those assets to investors."); *id.* ¶ 25 ("[B]eginning in
February 2021, Genesis and Gemini began offering the Gemini Earn program to retail

investors"); *id.* ¶ 49 ("340,000 retail investors . . . had crypto assets invested with Genesis

through the Gemini Earn program."); *id.* ¶ 30 (discussing interest rates offered to Gemini Earn

investors); ¶¶ 33-37 (describing how Defendants "promoted Gemini Earn as an investment"); ¶¶

56-67 (describing how "[t]he Gemini Earn Program" constituted the offer and sale of investment

contracts under *Howey*).

Here, just as in *Howey,* it is the entirety of the parties' interactions – regardless of

whether transactions took effect at different points in time as they did in *Howey* itself – that

constitutes the securities offering. 328 U.S. at 299–301 (finding three separate documents

"together" constituted an investment contract); *see also Glen-Arden Commodities, Inc.*, 493 F.2d

at 1034 ("[T]he test whether a contract constitutes" a security is "what character the instrument is

given in commerce by the terms of the offer, the plan of distribution, and the economic

inducements held out to the prospect"); *Telegram*, 448 F. Supp. at 367 (rejecting argument that

there were distinct sets of transactions at issue where "the economic reality of [Defendant's]

course of conduct is straightforward and rather easily understood"); *Hocking v. Dubois*, 885 F.2d

1449, 1457 (9th Cir. 1989) ("In attempting to determine whether a scheme involves a security,

the inquiry is not limited to the contract or other written instrument."). By entering into the

Gemini Earn Agreements, retail investors sought an opportunity to participate in and profit from

the entire Gemini Earn program, as alleged in the Complaint. *See, e.g.*, Compl. ¶¶ 26-29, 38-42,

45-48, 56-57. The Gemini Earn Agreements, while essential to an investor's participation in

Gemini Earn, were but one component of the entire Gemini Earn program, through which

Defendants offered and sold securities. Compl. ¶¶ 26-28, 38-42, 56-67. Thus, Defendants'

argument that the Court must limit its inquiry as to whether or not a "sale" or "offer to sell" has

been established as to the Gemini Earn Agreements alone, as opposed to the entire Gemini Earn program as alleged in the Complaint, is improper.

### B.    Defendants' Hypertechnical Arguments Regarding When Investors' Assets "Changed Hands" Lack Merit and Conflict with Well-Established Precedent

Defendants also argue that the SEC has not pleaded a "sale" or "offer to sell" because no "asset changed hands at the time a lender entered into the [Gemini Earn Agreements] – or that title passed. . . ." GTC Br. 7-8. Once again, Defendants ignore the economic reality of Gemini Earn that constituted the securities offering, and instead improperly focus on just one aspect of the securities offering, the Gemini Earn Agreements.

Section 2(a)(3) of the Securities Act broadly defines "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value. 15 U.S.C. § 77b(a)(3). Similarly, the terms "offer to sell" or "offer for sale" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. *Id*.  An offer occurs "[w]hen it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished." *Chris-Craft. Indus. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970). Accordingly, the focus of the Securities Act Section 5 requirement is a public offering, which is the *entire* process of distributing securities from an issuer to the public. *See United States v. Naftalis*, 44 U.S. 768, 773 (1979) ("offer" and "sale" are "statutory terms[] which Congress expressly intended to define broadly…[and] are expansive enough to encompass the entire selling process").

Thus, a statutory "offer" or "sale" encompasses a wide variety of circumstances – including precisely the type of activities Defendants engaged in with respect to Gemini Earn. *See e.g.*, Compl. ¶ 29 (Gemini published list of crypto assets eligible for investment and interest rates on its website and mobile application); *id*. ¶¶ 33-37, 49-50, 62-63 (both Genesis and Gemini

broadly advertised "yield" of Gemini Earn through websites and Twitter); *see e.g.*, *SEC v. Blockvest*, No. 18-cv-2287, 2019 WL 625163, *9 (S.D.Ca. Feb. 14, 2019) (the contents of "website[s] and "social media posts" concerning the assets constituted "offer" of securities); *Chris-Craft*, 426 F.2d at 574 (statements to the public and press constituted an "offer to sell"); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345–46 (11th Cir. 2022).

With respect to Defendants' argument that no statutory sale is established because the Gemini Earn Agreements provided "merely" a mechanism by which investors could choose at a later point in time whether to invest assets (GTC Br. 8), the Complaint alleges that Defendants did in fact "sell," their promise to pay interest in exchange for billions of dollars' worth of crypto assets. But even accepting Defendants' erroneous presumption that the point of sale is the execution of the Gemini Earn Agreements, the securities laws do not generally assign any relevance to whether and when a formal exchange of money takes place. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972) ("sale" occurred "when the parties to the transaction are committed to one another," was not when "the securities are transferred and paid for."). This standard for determining the point of sale "holds even if the later exchange of money and securities is contingent upon the occurrence of future events, such as the satisfaction of a financing condition, at least when the contingency is not so unlikely that it renders the stock transaction extremely speculative." *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008). Thus, "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 559 (2d Cir. 1985).[23]

---

[23] The Second Circuit extended *Radiation Dynamics*'s reading of "sale" in the Exchange Act to "sale" under the Securities Act in *Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992). There, the Court held that a "sale" occurs under the Securities Act, 15 U.S.C. § 77b(a)(3), for purposes of the Securities Act's

Notably, Defendants do not cite a single case applying the Securities Act that supports

their argument that that the definition of "sale" or "offer to sell" has not been met. Nor could

they, because asking this Court to restrict the term "sale" to the point in time that the Gemini

Earn Agreement was executed is contrary to well-settled law. The unregistered offering here

constituted the entire promotion and distribution of Gemini Earn to investors. *See, e.g.*, Compl.

¶ 25 ("[B]eginning in February 2021, Genesis and Gemini began offering the Gemini Earn

program to retail investors . . . [a]s of November 16, 2022, approximately 340,000 retail

investors . . . had crypto assets invested with Genesis through the Gemini Earn program").[24]

## IV.   THE COMPLAINT SUFFICIENTLY ALLEGES A BASIS FOR INJUNCTIVE RELIEF AND DISGORGEMENT

Defendants further seek to dismiss the SEC's demand for permanent injunctive relief and

disgorgement (GGC Br. 22-24), but a Rule 12(b)(6) "motion to dismiss is addressed to a 'claim'

– not to a form of [relief]." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5

(S.D.N.Y. 2010); s*ee SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*,

568 U.S. 442 (2013) (reversing a trial court's "dismiss[al]" of a request for injunctive relief); *see*

*also Green v. New York City Dep't of Correction*, No. 98 CIV 825 (JGK), 1999 WL 219911, at

---

statute of limitations, when "'the parties obligate [ ] themselves to perform what they had agreed to perform' even if the formal performance of their agreement is to be after a lapse of time." 962 F.2d at 173 (citation omitted).

[24] Gemini purports to claim an exemption pursuant to Section 4(a)(1) of the Securities Act, arguing that the SEC did not allege that it is an issuer of Gemini Earn. GTC Br. 10 n.12. The SEC is not required to plead the inapplicability of particular exemptions. Rather, it is the *defendant* that must affirmatively plead its entitlement to an exemption from registration. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). Here, Defendants are liable for violating Section 5 because they "'engaged in steps necessary to the distribution of [unregistered] security issues.'" *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc*., 120 F.2d 738, 741 (2d Cir. 1941)) by, among other things, creating, launching, promoting, and facilitating the investment opportunity through their services and platform. *See e.g.*, Compl. ¶¶ 2, 25-26, 29, 34-37, 49-50, 62. For the same reasons, the Court should not entertain Gemini's self-serving argument describing its role in Gemini Earn as one of "limited agency." GTC Br. 10.

*8 (S.D.N.Y. Apr. 15, 1999) (holding that it was "premature" to consider a motion to dismiss a request for injunctive relief).[25]

The Complaint alleges that Defendants engaged in billions of dollars' worth of unregistered offers and sales of securities, that Defendants continue to do business in the crypto asset industry, that Defendants' conduct has already significantly harmed hundreds of thousands of retail investors, and that Genesis intends to reengage in crypto asset lending activities. Compl. ¶¶ 1, 8. These allegations are more than sufficient to support the SEC's request for injunctive relief. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975) ("[T]he commission of past illegal conduct is highly suggestive of the likelihood of future violations."); *SEC. v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 390 (S.D.N.Y. 2010) (same).

Defendants' arguments on disgorgement fare no better. "[R]ulings on remedies are typically made after finding liability— not at the motion to dismiss stage." *SEC v. Drake*, No. 2:17–cv–06204–CAS (GJSx), 2017 WL 6507766, at *7 (C.D. Cal. Dec. 18, 2017). Rather, "at the pleading stage . . . all that is necessary is that the Court find that disgorgement would be appropriate if the SEC prevails in its case-in-chief." *SEC v. Cotton*, No. SACV 06-0905 AG(ANX), 2006 WL 6382128, at *11 (C.D. Cal. Dec. 21, 2006).[26] The SEC has adequately pled

---

[25] Defendants' request is effectively a motion to strike the pleadings under Rule 12(f), which is disfavored "unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

[26] Defendants' own authority confirms the point. Defendants misleadingly cite *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) for the proposition that "[t]he SEC is also required to provide 'a reasonable approximation of profits causally connected to the violation,'" (GGC Br. 23), but the Second Circuit made clear (in the same sentence quoted by Defendants) that SEC is only required to provide a reasonable approximation when "disgorgement [is] *ordered*." 101 F.3d at 1475 (emphasis added). Defendants also cite *SEC v. Fernandez* (GGC Br. 24) in which the court found, *at the final judgment stage*, the SEC needed to produce additional information in order to provide a reasonable approximation of disgorgement. No. 6:19-CV-1843-RBD-LRH, 2021 WL 6125520, at *3 (M.D. Fla. Feb. 22, 2021). Rather than dismiss the request for relief, as Defendants would have the Court do in the instant case, the court in *Fernandez* invited the SEC to submit additional evidence supporting its disgorgement request. *Id.*

that Defendants received proceeds from unregistered offers and sales of securities, Compl. ¶¶ 1,

6-7, which is the starting point from which disgorgement is to be calculated. *See, e.g.*, *SEC v.*

*Wyly*, 56 F. Supp. 3d 394, 431 (S.D.N.Y. 2014).

## CONCLUSION

For all the foregoing reasons, Defendants' Motions to Dismiss should be denied.[27]

Dated:  July 21, 2023                               Respectfully submitted,

                                                    By:    *s/ Edward J. Reilly*
                                                           Edward J. Reilly
                                                           Laura E. Meehan
                                                           U.S. Securities and Exchange Commission
                                                           100 F Street NE
                                                           Washington, DC 20549-4473
                                                           Telephone: (202) 551-6791 (Reilly)
                                                           Email: reillyed@sec.gov
                                                           *Attorneys for Plaintiff*
                                                           *Securities and Exchange Commission*

---

Defendants further cite to *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1088 (N.D. Cal. 2015) and *SEC v. Norton*, No. 95 CIV. 4451 (SHS), 1998 WL 691043, at *5 (S.D.N.Y. Sept. 30, 1998) (GGC Br. 24), but these cases addressed the SEC's disgorgement claims at summary judgment, not at the motion to dismiss stage. *Alexander*, 115 F. Supp. 3d at 1075; *Norton*, 1998 WL 691043 at *1.

[27] In the alternative, if the Court grants all or a part of Defendants' motion to dismiss (and it should not), the SEC seeks leave to amend the Complaint under Federal Rule of Civil Procedure 15(a). Leave for amendment would be particularly appropriate here because there have been no previous amendments, no scheduling order has been issued, and no discovery has been conducted. *See Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (vacating trial court's denial of motion to amend when no discovery had occurred and amendment would not affect a scheduling order).

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on July 21, 2023, I filed the foregoing through the Court's CM/ECF system, which will send notifications of such filing to all counsel of record.

By:  *s/ Edward J. Reilly*
Edward J. Reilly
 U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-4473
Telephone: (202) 551-6791 (Reilly)
Email:  reillyed@sec.gov
*Attorney for Plaintiff*
*U.S. Securities and Exchange Commission*