UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

    v.

GENESIS GLOBAL CAPITAL, LLC and GEMINI TRUST COMPANY, LLC,

    Defendants.

Case No. 23-CV-287 (ER)

**ORAL ARGUMENT REQUESTED**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT GENESIS GLOBAL CAPITAL, LLC'S
MOTION TO DISMISS THE COMPLAINT OR
<u>STRIKE CERTAIN OF PLAINTIFF'S REQUESTS FOR RELIEF</u>**

Jason Gottlieb
Daniel C. Isaacs
William Roth
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Telephone:  (212) 735-8600
Facsimile:  (212) 735-8708

*Attorneys for Defendant
Genesis Global Capital, LLC*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I. Gemini Earn Loan Agreements Are Not Investment Contracts ......................................... 2

    A. The Complaint Fails to Allege a Common Enterprise............................................ 2

        1. The Complaint Fails to Establish Horizontal Commonality....................... 2

        2. The Complaint Fails to Establish Vertical Commonality, Which In Any Event Is Insufficient to Establish a Common Enterprise ......................................................................................................... 4

    B. The Complaint Fails to Allege Gemini Earn Customers Expected Profits from Defendants' Efforts ................................................................................ 5

II. The Gemini Earn Loan Agreements Are Not Security Notes Under *Reves* ....................... 7

    A. Gemini Earn Customers and Defendants Were Motivated By Conventional Loan Terms.............................................................................................. 7

    B. There Was No Plan of Distribution for the Non-Transferable Loans ..................... 7

    C. The Third and Fourth *Reves* Factors Weigh Against a Finding that the Loan Agreements Were Security Notes............................................................. 8

III. The Court Should Strike the SEC's Requests for Injunctive Relief and Disgorgement........................................................................................................................ 10

CONCLUSION............................................................................................................................. 10

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019)...............................................................................3

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985)..............................................................................................6

*Harman v. Harper*,
  914 F.2d 262 (9th Cir. 1990) ............................................................................................5

*Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*,
  683 F. Supp. 2d 278 (E.D.N.Y. 2010) ..........................................................................5, 9

*Kirschner v. JPMorgan Chase Bank, N.A.*,
  No. 17 Civ. 6334 (PGG), 2020 WL 2614765 (S.D.N.Y. May 22, 2020) .........................9

*Landreth Timber Co. v. Landreth*,
  471 U.S. 681 (1985)..........................................................................................................8

*LeBrun v. Kuswa*,
  24 F. Supp. 2d 641 (E.D. La. 1998)..................................................................................9

*Reeder v. Succession of Palmer*,
  736 F. Supp. 128 (E.D. La. 1990).....................................................................................8

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994)..................................................................................................2

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990)................................................................................................... passim

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90 (2d Cir. 1978)..............................................................................................10

*SEC v. Edwards*,
  540 U.S. 389 (2004)..........................................................................................................6

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020)...........................................................................3, 5

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996)............................................................................................2

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................................................................. 3, 9

*SEC v. Thompson*,
    732 F.3d 1151 (10th Cir. 2013) ................................................................................................ 8

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .................................................................................................... *passim*

*SEC. v. Wallenbrock*,
    313 F.3d 532 (9th Cir. 2002) .................................................................................................... 8

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) .................................................................................................................. 8

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
    651 F.2d 1174 (6th Cir. 1981) ............................................................................................ 7, 8

*United States v. Pierre*,
    No. 19-CR-783 (SHS), 2021 WL 4150969 (S.D.N.Y. Sept. 13, 2021) .................................. 4

**STATUTES & RULES**

Fed. R. Civ. P. 8 ........................................................................................................................... 10

Fed. R. Civ. P. 12(b) ...................................................................................................................... 1

**OTHER AUTHORITIES**

*Kirschner v. JP Morgan Chase Bank, N.A.*,
    Court of Appeals Docket No. 21-2726, Letter on behalf of Amicus Curiae
    SEC, ECF No. 207 (2d Cir. July 18, 2023) ............................................................................. 7

Defendant Genesis Global Capital, LLC ("GGC") respectfully submits this reply memorandum of law in further support of its motion (the "Motion"), under FRCP Rules 12(b)(1) and 12(b)(6), to dismiss Plaintiff Securities and Exchange Commission's ("SEC") Complaint (the "Complaint" or the "Compl."), or in the alternative, to strike the Complaint's prayer for a permanent injunction and disgorgement.[1]

## PRELIMINARY STATEMENT

The SEC's Opposition ("Opp.") doubles down on the Complaint's core defect—an arbitrary "securitization by hindsight" approach that disregards the nature of the agreements between Defendants and Gemini Earn customers. There are no coherent limiting principles to the SEC's approach, which, if adopted by the Court, could be employed to convert any loan into a security. The Opposition fails to reckon with the ordinary meaning and common-sense interpretation of the Gemini Earn Loan Agreement, and asks the Court to retroactively characterize a straightforward lending arrangement into a securities transaction.

The Complaint alleges that Gemini Earn customers lent digital assets to Defendants, who in turn paid them an interest rate that was revised on a monthly basis to stay competitive with the lending market. There was no opportunity for customers to earn more—or risk that they would earn less—than those agreed-to rates. Gemini Earn customers therefore had no vested interest in either of the Defendants' businesses beyond the fixed interest rate they were promised under the Loan Agreements. They had no skin in GGC's game. Moreover, the Loan Agreements at issue made it crystal clear to all parties that Gemini Earn lending was open term and callable on demand.

The arrangement between Gemini Earn customers and GGC—which bore all the hallmarks

---

[1] GGC also joins in the arguments made by co-defendant Gemini Trust Company, LLC's reply in support of its own motion to dismiss the Complaint to the fullest extent applicable to GGC.

of a conventional lending agreement between borrowers and lenders—did not plausibly constitute an investment contract or security note, and this Court should not retroactively re-define the Loan Agreements as securities.

## ARGUMENT

**I.  Gemini Earn Loan Agreements Are Not Investment Contracts**

### A.  The Complaint Fails to Allege a Common Enterprise

The Complaint fails to allege how the Gemini Earn Loan Agreements (or program as a whole) satisfied *Howey*'s first and second prongs of an investment in money in a common enterprise. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

#### 1.  The Complaint Fails to Establish Horizontal Commonality

The Opposition does not, because it cannot, dispute that Gemini Earn customers' borrowing rates were categorically distinct from the shared profits and risks required for horizontal commonality. As the Opposition concedes, under *Revak v. SEC Realty Corp.*, "horizontal commonality is established by a pooling of assets *and sharing profits and risks of the enterprise*." Opp. at 5–6 (citing 18 F.3d 81, 87 (2d Cir. 1994) (emphasis added)). Following *Revak*, it is uncontroversial that where a borrower aggregates lenders' assets, but lenders do not share in the upside or downside of *investing* in the *business* of the borrower, an arrangement does not satisfy *Howey*'s first or second prongs. *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996) ("commingling in itself is but an administrative detail; it is the inter-dependency of the investors that transforms the transaction substantively into a pooled investment"). The SEC has thus failed to allege how customers' "fortunes" were "tied together" as required by *Revak*.

The Opposition attempts to extinguish the relevance of specific *forms* of risk-sharing arrangements, and ignores that the Gemini Earn program (as alleged) has no risk-sharing component at all. As the Motion argued (*see* Mot. at 9–11), the Complaint fails to adequately

allege horizontal commonality because the *only* return Gemini Earn customers expected was the interest rate on the digital assets they individually lent through the program. Accordingly, the SEC has failed to allege that each Gemini Earn customer's interest rate was in any way contingent on how much other customers lent the program, or the success of Gemini or GGC in general. In other words, there was no common enterprise among Gemini Earn customers.

The cases cited in the Opposition in support of the SEC's argument that "courts do not require an agreement to distribute profits *pro rata*" (or any particular form of profit-sharing) to establish horizontal commonality (*see* Opp. at 7–8), all emphasize that *some* shared risk is nonetheless necessary. In *Telegram*, for example, Judge Castel specifically held that horizontal commonality existed when the value of "Grams" would rise or fall depending on the success or failure of Telegram's blockchain. *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020) ("The ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain. If the TON Blockchain's development failed prior to launch, all Initial Purchasers would be equally affected as all would lose their opportunity to profit."). Similarly, in *ATBCOIN*, Judge Broderick found it determinative that the plaintiff had "plausibly alleges that the 'potential profits stemming from the future valuation of the ATB Coins [] w[ere] entirely reliant' on the success of Defendants' new blockchain." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019). Finally, in *Kik*, Judge Hellerstein found there was horizontal commonality because "investors reaped their profits in the form of the increased value of [Kik's token]." *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020). In each of these cases, and in obvious contrast to the facts here, investors bet on the defendant's success—not just its solvency—with the opportunity for unbounded potential gains and losses.

The Opposition also argues that the Loan Agreements were loans in name only. Opp. at 8.

The Opposition cites *United States v. Pierre*, No. 19-CR-783 (SHS), 2021 WL 4150969, at *4 (S.D.N.Y. Sept. 13, 2021) for the proposition that the title of any given agreement is not dispositive.  *Pierre*, however, is easily distinguishable.  Pierre was a stock trader who convinced roughly 100 people to give him their money to invest, promising to "earn a 20% return on their initial investment every 60 days through stock trading."  *Id.* at *1.  To paper his scheme, Pierre executed a "guaranteed *investment* loan" agreement with each participating investor.  *Id*. at *4 (emphasis added).  Furthermore, at trial, one of Pierre's investors testified that Pierre had to add the word "loan" to the agreement because he was not a licensed investment broker.  *Id*.  On this record, the court found that a jury could reasonably conclude the agreements constituted investment contracts under *Howey*.

The facts here are nothing like *Pierre*.  Not a single aspect of the Loan Agreements—or the economic relationship they reflected—plausibly led any party to understand the arrangement to be an investment contract.  To the contrary, the Loan Agreements outlined the lending terms, and further expressly stated that each party agreed "that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws."  ECF 34 at 6; *see also* ECF 35-1 at 16.  That is the plain meaning and structure of the parties' agreement, and not, as the SEC puts it, elevating "form over substance."  Opp. at 2.

### 2. The Complaint Fails to Establish Vertical Commonality, Which In Any Event Is Insufficient to Establish a Common Enterprise

The Opposition's argument that the Complaint properly alleges strict vertical commonality does not rescue the SEC's case.  As explained in *SEC v. Ripple Labs, Inc.*, "[t]he Second Circuit has not addressed whether the strict vertical commonality theory can give rise to a common enterprise."  No. 20 CIV. 10832 (AT), 2023 WL 4507900, at *8 n.12 (S.D.N.Y. July 13, 2023); *see also Kik*, 492 F. Supp. at 178 (same).  The SEC's reliance on older non-binding district court

4

cases is thus unavailing, and particularly confounding in view of the SEC's own argument that the Court should "not follow" the "portions of *Ripple* [the SEC believes] were wrongly decided." *See* Opp. at 11 n.11. The SEC's attempt to rely on strict vertical commonality, in lieu of the longstanding standard for commonality in the Second Circuit, demonstrates precisely how novel the SEC's approach to liability is in this case.

In any event, the SEC's arguments for strict vertical commonality fall short. First, the fact that Genesis earned money by "lending crypto assets to institutional counterparties," and also had "to pay the interest . . . promised to Gemini Earn investors," could not "create[] strict vertical commonality." Opp. at 9–10. If it did, every lending arrangement where the lender also conducted its own business (*i.e.* all of them) would be an investment contract. That is not the law.

Furthermore, the Opposition's argument that Genesis's ongoing bankruptcy "demonstrates that the fortunes of the investors were tied to the fortunes of the promoter" is contrary to clear precedent and common sense. Again, if a borrower's interest in a lender's *solvency* transformed a loan into a security, every loan would be a security, contrary to established precedent. *See Harman v. Harper*, 914 F.2d 262, 262 (9th Cir. 1990) ("While the repayment of the mortgage may have depended on the solvency of the borrower, this is not the same as depending on entrepreneurial efforts") (citation omitted); *see also Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010) (describing a non-security note, and observing "[w]hile payment might not, as here, be made in the event of a default, that default is not something that is unique to any 'investment-like' character of the asset purchase, but is a risk attendant to any sale").

**B. The Complaint Fails to Allege Gemini Earn Customers Expected Profits from Defendants' Efforts**

For similar reasons, the Complaint also fails to allege that the Loan Agreements satisfied *Howey*'s third and fourth prongs, *i.e.* that customers expected profits derived from Defendants'

5

managerial efforts.  Gemini Earn customers expected their market-driven interest rates (Compl. ¶¶ 27, 29), nothing more and nothing less.  While the Complaint conclusorily alleges that returns "were dependent on Genesis' managerial efforts and risk management in its lending activities" (Compl. ¶ 41), the Opposition merely recites the circular argument that "if Genesis was not successful in generating returns based on the pooled crypto assets, Defendants could not continue offering the 'highest rates' in the market to investors on a monthly basis." Opp. at 12.  Here, again, the SEC conflates a borrower's ever-present interest in a lender's existence as a going concern with an expectation of profits from an investment issuer's efforts.

The Opposition also does not engage with the cases setting out why lending programs like Gemini Earn are distinct from investments products that turn on the efforts of the manager. Instead, the Opposition relies on *SEC v. Edwards*, which held that a fixed-rate product "can be an 'investment contract.'"  540 U.S. 389, 397 (2004).  But neither *Edwards* nor any other case obviates the need for managerial efforts that drive a customer's returns.  For example, in *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Second Circuit relied heavily on the fact that Merrill Lynch generated and oversaw interest in the secondary market for the relevant products, highlighting that "resale in the secondary market created and maintained by Merrill Lynch is crucial to the investor." 756 F.2d 230, 240 (2d Cir. 1985).

Consistent with *Edwards* and *Gary Plastic*, GGC cited a string of cases illustrating how agreements for fixed-rate lending terms like those offered in Gemini Earn *do not* entail any expectation of profit based on the efforts of the lender, and therefore constitute loans rather than security transactions.  *See* Mot. at 12–13.  The Opposition addresses these cases in two cursory footnotes, dismissing them as "inapposite." Opp. at 12 nn.12–13.  That is *ipse dixit*.  These cases, including *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174,

1185 (6th Cir. 1981), state that when returns are "contingent only upon the passage of time," loans with guaranteed market-based rates do not constitute securities under *Howey*. *Id*.

## II.  The Gemini Earn Loan Agreements Are Not Security Notes Under *Reves*

The Complaint also fails to allege that the Loan Agreements (or the Gemini Earn program in general) constituted security notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990).

### A.  Gemini Earn Customers and Defendants Were Motivated By Conventional Loan Terms

The salient features of the Gemini Earn loans were that they were short term (open ended) loans receiving reasonable rates of interest revised on a monthly basis. The Complaint and the Opposition are devoid of any facts undergirding the SEC's assertion that Gemini Earn customers and GGC's motivations were not identical to the motivations of commercial lenders and borrowers. *See* Compl. ¶¶ 27–30. The parties' non-investment motivations are corroborated by the SEC's admissions that the Loan Agreements were not transferrable or assignable. Opp. at 16.

The Opposition's suggestion that the Loan Agreements were akin to common equity shares or bonds (*see* Opp. at 15), not only ignores these features, but also eviscerates any coherent distinction between lending arrangements and security transactions. The SEC's inability to make this distinction dooms its case. Remarkably, when the Second Circuit recently invited the SEC to explain its approach to the distinction between lending arrangements and security transactions, the SEC explicitly declined to do so. *See Kirschner v. JP Morgan Chase Bank, N.A.*, No. 21-2726, ECF 207 (2d Cir. July 18, 2023). In short, the Opposition's implied framework would impermissibly supplant the parties' express intent with the SEC's own view—whatever that view may turn out to be. *See* Mot. at 20.

### B.  There Was No Plan of Distribution for the Non-Transferable Loans

With respect to the second *Reves* factor, the Complaint acknowledges that the Loan

7

Agreements offered to Gemini customers were non-transferable. Compl. ¶ 26. While the Opposition emphasizes that 340,000 customers agreed to participate in the loan program, it does not refute that the Loan Agreements were not actively traded, nor that there was no secondary market for them. In these critical ways, the Loan Agreements were distinct from the instruments "sold to a broad segment of the public" mentioned in *Reves*, as well as the promissory notes at issue in the out-of-circuit cases cited in the Opposition. *See Reves*, 494 U.S. at 68 (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) (stock of closely held corporation)); *Tcherepnin v. Knight*, 389 U.S. 332, 337 (1967) (nonnegotiable but transferable "withdrawable capital shares" in savings and loan association),[2] and *Howey*, 328 U.S. at 295 (units of citrus grove and maintenance contracts); *see also* Opp. at 17 (citing *SEC. v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) and *SEC v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013)).

> **C.    The Third and Fourth *Reves* Factors Weigh Against a Finding that the Loan Agreements Were Security Notes**

The Complaint fails to allege facts suggesting that the investing public would have expected that their loans were securities. Every relevant provision of the Loan Agreements expressly characterized the agreement as a loan. *See* Mot. at 20, ECF 35-1 at 2–5. There was also, as noted above, no secondary market for the loans. Despite the Opposition's attempt to disregard these key features as "mere formalisms," they collectively defined the very "economic realities" on which the Opposition invites the Court to focus (*see* Opp. at 19–20), and weigh against a finding that lending agreements are securities. *See Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La. 1990), *aff'd sub nom.*, *Reeder v. Palmer*, 917 F.2d 560 (5th Cir. 1990) (holding that payments made to participants in an alleged Ponzi "travel club" were not securities under *Reves*

---

[2]    As explained in *Union Planters Nat'l Bank*, the critical factor in *Tcherepnin*, not present in the instant case, was that "[p]rospective 'profits' in the form of dividends were *uncertain*; they were a function of the profits of the association, which were in turn tied to the managerial skills of the business." 651 F.2d at 1184 (emphasis added).

8

where participants were promised a 6% return per month and their "only expectation could be that of loan repayment with a fixed – albeit high – rate of interest."); *Kirschner v. JPMorgan Chase Bank, N.A.*, No. 17 Civ. 6334 (PGG), 2020 WL 2614765, at *9 (S.D.N.Y. May 22, 2020) ("[T]he Credit Agreement and CIM would lead a reasonable investor to believe that the Notes constitute loans, and not securities."); *LeBrun v. Kuswa*, 24 F. Supp. 2d 641, 648 (E.D. La. 1998) ("After the fact recharacterizations cannot affect this prong").  The SEC cannot claim to favor substance over form, then disregard the substance.

      Rather than contend with the plain meaning the Loan Agreements, the Opposition cherry-picks language in Gemini's marketing materials, waves away inconvenient cases as "factually inapposite," and cites a series of cases standing for the uncontroversial rule that disclaimers alone cannot override the fundamental nature of an agreement.  Opp. at 20.  In *Telegram*, for example, Judge Castel noted that Telegram's boilerplate disclaimers and public statements "emphasizing the consumptive use of Grams and rejecting any expectation of profit" could "not control" the court's consideration of the "economic reality" of the relevant token purchases.  *Telegram*, 448 F. Supp. 3d at 381.  Turning *Telegram* on its head, the Opposition suggests the Court should disregard the "economic reality" set out in the Loan Agreements and re-characterize the agreements based solely on certain of Gemini's marketing statements.  Opp. at 20.  It should not.

      Finally, because the first three factors weigh so heavily against a finding that the Loan Agreements are security, the existence of risk mitigation factors need not be considered; the lack of a specialized regulatory regime does not by itself transform a financial instrument into a security.  *See Intelligent Digit. Sys.*, 683 F. Supp. 2d at 285.  The SEC's suggestion that "any ruling that the notes issued through Gemini Earn are not securities would leave these investors totally unprotected" (Opp. at 21) is hyperbole and an attempt to broaden its own jurisdiction.  The SEC

regulates securities and securities exchanges, within the statutory limits set forth by Congress.  It is not a "regulator of last resort."

### III. The Court Should Strike the SEC's Requests for Injunctive Relief and Disgorgement

The Complaint specifically admits that "the Gemini Earn program has been terminated" (Compl. ¶ 8) and contains no additional allegations that plausibly support an inference that Defendants could restart the program in the future.  Thus, there is no reasonable likelihood of recurrence.  *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978).  The SEC dodges its pleading failure by claiming that it is "premature" to consider its failure.

With respect to disgorgement, the SEC fails to allege even a ballpark amount of money that GGC profited on related to the Earn program itself, let alone a particular amount it believes should be disgorged.  And the SEC's dismissive response of "trust us, we'll figure it out later" does not pass muster under Rule 8.

### CONCLUSION

For the foregoing reasons, GGC respectfully requests that the Court dismiss the Complaint in its entirety against GGC, or, in the alternative, strike the SEC's requests for a permanent injunction and disgorgement, and grant such other and further relief as is just and proper.

Dated: New York, New York
August 18, 2023

MORRISON COHEN LLP

By: /s/ *Jason Gottlieb*
Jason Gottlieb
Daniel C. Isaacs
William Roth
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Defendant Genesis Global Capital, LLC*